Larry P. HALLMAN, Appellant,

v.

UNITED STATES, Appellee.

No. 12007.

District of Columbia Court of Appeals.

Argued Oct. 19, 1978.

Decided Sept. 26, 1979.

**216**

Stuart Stiller, Washington, D. C., for appellant.

Peter C. DePaolis, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the brief was filed, and John A. Terry and Michael W. Farrell, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEBEKER and FERREN, Associate Judges, and YEAGLEY, Associate Judge, Retired.

NEBEKER, Associate Judge:

Appellant seeks reversal of his conviction on two counts of first-degree murder while armed, D.C.Code 1973, §§ 22–2401, –3202, one count of felony murder, D.C.Code 1973, § 22–2401, and one count of arson, D.C.Code 1973, § 22–401. Appellant contends that the trial court erred in several ways: (1) in denying appellant's motion for a mistrial; (2) in refusing to order disclosure of the juvenile convictions of the government's key witness; (3) in refusing to permit defense counsel to question appellant regarding his prior convictions; and (4) in requiring the jury to use a particular form for its verdict.* We find that the court erred in

refusing to order the juvenile records of the government witness for its "*in camera consideration*," as provided in *Lewis v. United States*, D.C.App., 393 A.2d 109 (1978), *aff'd on rehearing*, 408 A.2d 303 (1979). Accordingly, we remand; in all other respects, we affirm.

The facts, viewed in the light most favorable to the government, as we are required to do, *Creek v. United States*, D.C.App., 324 A.2d 688, 689 (1974), reveal that Curtis Arrington and Delores Davis were murdered on the evening of October 22, 1975. One of the government's witnesses, Raymond Paris, confessed that he and three other individuals, one of whom was appellant, committed the murders. Paris testified at trial that he, appellant, and two others were at Curtis Arrington's apartment on October 22, 1975, looking for an individual named Slim. The group had been in Arrington's apartment a few nights before when Paris and Slim had an argument which ended with Paris being stabbed in the arm by Slim. After Paris had received medical attention, the four companions initiated a two-day search for Slim which was unsuccessful. The group then returned to Arrington's apartment to question him concerning Slim's whereabouts. After the group had been admitted to the apartment, Paris walked into the kitchen where he subsequently overheard Arrington and appellant arguing. When Paris returned to the living room, appellant announced that he was going to hurt Arrington. Another member of the group pulled a gun on Arrington, but Paris intervened, advising that a gun would make too much noise. He then procured a butcher knife from the kitchen. Arrington was bound and taken to the bathroom and set upon the commode. Upon being asked where Slim could be found, Arrington answered that he did not know. Thinking that Arrington had lied, Paris declared that he "should go ahead and kill" him. One of the group then hit Arrington across the side of the head with the butt of a gun, knocking him off the com-

---

* We have reviewed appellant's other arguments regarding the lack of premeditation, the failure to advise the jury of the lesser included offense of manslaughter, and the indirect reference by the prosecutor to appellant's silence after arrest, and find them to be without merit.

mode. Paris picked Arrington up and told one of the group to obtain a sheet to cover Arrington's face. Another took the knife from Paris and, when the sheet was in place, stuck the knife into the back of Arrington's neck. The group decided that all should share the blame and the knife was passed around with each of the four plunging the knife into Arrington's body, a total of 67 times.

Moments later, Arrington's girl friend, Delores Davis, entered the apartment before all of the members of the group could hide. She was grabbed by one of the group and taken to the bathroom where she was shown the body of her boyfriend. She then began pleading for her life as the group discussed what to do with her. Before reaching a final decision, three of the four, including appellant, raped her. Thereafter, appellant stated that she should be killed because he was not going to take a chance. Additional knives were secured, the woman was bound, and a pillow was placed over her head. Appellant then plunged his knife into her side. Each of the others began stabbing her with their own knives. The autopsy report indicated that the woman was stabbed thirty-five times.

Appellant then went to the kitchen, blew out the pilot light on the stove, and turned on the burners. Paris went to a second bedroom and set a sheet on fire. The four then fled out the back of the apartment with the knives wrapped in a sheet. The knives were dumped into a storm sewer and the sheet was stuffed into a trash can. After stopping at a store to buy something to drink, the group returned to the area where a crowd had gathered to watch the fire department fight the fire. The bodies of Arrington and Davis were found by the firefighters. The police were notified and an investigation was conducted. An autopsy was subsequently performed on the bodies.

Two days later, Paris turned himself in to the police. He identified the location of the knives which the police were able to retrieve. In his first confession, Paris stated that he had served as a lookout and that he had not taken part in the actual slayings. He also stated that the motive for the killings concerned narcotics. Sometime later, but prior to appellant's trial, Paris admitted that his first confession was inaccurate, that he had, indeed, participated in the slayings and that the group had gone to Arrington's apartment looking for Slim. In his second confession, Paris related the events that he told at trial.

During the trial, Paris was vigorously cross-examined as to his prior inconsistent statements and he admitted that his first statement was not entirely true. Other government witnesses generally substantiated Paris' second version of the events surrounding the murders.

Appellant first argues that a mistrial should have been granted when a woman in the public seating area of the courtroom began to cry during the prosecutor's opening statement. The individual was taken out of the courtroom and the judge immediately admonished the jury to decide the case without prejudice or sympathy, directing the jury to try the case on the facts. Appellant argues that the lady's screaming and shrieking had an impact on the jury which was not remedied by the court's cautionary instruction. The court responded that the woman's sobbing and weeping did not rise to the level of shrieking and screaming and that the court was satisfied that the jury would not be guided by sympathy in its determination of the case.

■ The granting of a mistrial is committed to the broad discretion of the trial court. Cf. *Hammond v. United States*, D.C. App., 345 A.2d 140 (1975) (whether to grant mistrial due to outburst by defendant is matter committed to discretion of trial court). The burden of showing prejudice to support a motion for mistrial is upon the movant. *Adams v. United States*, 317 U.S. 269, 281, 63 S.Ct. 769, 87 L.Ed. 1142 (1942). We hold that appellant has failed to demonstrate, on this record, an abuse of discretion in denying the motion for mistrial.

■ Issue is raised that the trial court erred in precluding appellant's attorney in

direct examination from questioning the appellant concerning his prior convictions. Appellant relies on *Kitt v. United States*, D.C.App., 379 A.2d 973 (1977), as authority for this proposition. In *Kitt*, this court stated that either party should be free to bring out the prior convictions of its witnesses. However, the court, relying on *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), also held that the trial court's failure to allow the parties to do so in that case was not reversible error. We must apply that test here. The prejudice, if any, suffered as a result of the trial court's refusal to permit this line of questioning is insignificant when contrasted with the strength of the evidence tending to prove appellant's guilt, and "we are able to say 'with fair assurance . . that the judgment was not substantially swayed by the error.'" *Kitt v. United States, supra* at 975, quoting *Kotteakos v. United States, supra* at 764–65, 66 S.Ct. 1239.

Appellant also contends that the verdict form used by the jury was misleading. He claims that the form encouraged the jury to find appellant guilty of the first count on the form so that they would not have to wade through the remaining lesser offenses listed on the form. Having reviewed the form, we are of the opinion that it simplified, rather than complicated, the task of the jury to determine innocence or guilt on each of the multiple counts. The jury evidently had no problem understanding the instructions on the verdict form since no errors were made. Furthermore, the general jury instructions given by the court negate any possibility that the

form could have misled the jury in the way alleged by appellant. *Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979). We believe that the jury was not influenced by the use of the verdict form and hold that no reversible error was occasioned thereby.

Finally, appellant argued that the trial court erred in refusing to order the disclosure of the juvenile record of the government's witness, Raymond Paris. The record on appeal reveals that appellant had moved for production of this evidence to demonstrate Paris' motive for testifying and that appellant's motion was denied. (Appellant contends that Paris, who was eighteen years of age at the time of trial, was hoping for a sentence under the Youth Corrections Act, 18 U.S.C. § 5010(a) or (b) (1976), and thus had reason to fabricate his testimony.) A similar argument was made in the case of *Tabron v. United States*, D.C.App., 410 A.2d 209 (1979). This court remanded that case for the trial court to consider the significance of the juvenile adjudications in light of the guidelines set forth in *Lewis v. United States, supra, aff'd on rehearing*, 408 A.2d 303 (1979). *Lewis* is controlling here and, therefore, we remand the instant case with instructions identical to those in *Tabron*.

*Remanded for further proceedings.*