Peter C. BLISS, Appellant,

v.

UNITED STATES, Appellee.

Nos. 80–1060, 80–1075.

District of Columbia Court of Appeals.

Argued March 18, 1982.

Decided May 6, 1982.

Andrew L. Lipps, Public Defender Service, Washington, D. C., with whom Silas J. Wasserstrom and William J. Mertens, Public Defender Service, Washington, D. C., were on briefs, for appellant.

William J. Birney, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry, Edward D. Ross, Jr. and Wayne P. Williams, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before NEWMAN, Chief Judge, and KELLY and MACK, Associate Judges.

KELLY, Associate Judge:

Appellant was convicted by a jury of felony-murder while armed and armed robbery of a cabdriver (No. 80–1060) and, in another, unrelated trial, of burglary in the second degree while armed and armed robbery of the Logan Inn (No. 80–1075). In this consolidated appeal, he alleges that (1) his right to cut off questioning was not scrupulously honored; (2) his statements to the police about the shooting of the cabdriver were involuntary; (3) his confession to the Logan Inn robbery was the fruit of the statement that the police had improperly obtained from him; (4) his confession to the Logan Inn robbery was involuntary; and (5) his motion for mistrial in the Logan Inn robbery trial should have been granted because of the prosecutor's improper cross-examination. Finding no reversible error, we affirm.

## I

### A. The Facts

At approximately 3:00 a. m. on June 30, 1978, Officer Beverly Medlock was awakened by the sound of gunshots outside her apartment at 78 Brandywine Street, Southwest, in Washington, D. C. She went outside and saw two men standing by a taxi that had apparently struck a tree. The body of the cabdriver was in the back seat. She identified herself as a police officer, and the person on the passenger's side fled. With her gun drawn, Officer Medlock approached the other person, appellant, who was standing by the driver's side of the cab. She ordered him to stop and searched him. She then asked her next door neighbor to stay with appellant while she chased the person who had fled.

Unable to catch the other suspect, Officer Medlock returned about one minute later. Appellant told her that he had been shot and that the cab driver had just jumped in the back seat and started shooting. At this point, Officer Medlock told appellant that he was under arrest and orally advised him of his *Miranda* rights. He told her that he understood what was being said.

Officer Ronnie Carter arrived on the scene at approximately 3:15 a. m. Appellant, who was trying to treat his injured left leg, told Carter that he had taken a taxi from the Greyhound bus terminal to another location in Southeast and that he was forced to drive the cab while the cabdriver jumped into the back seat, took a gun from the other passenger and started shooting. Carter advised appellant that anything he said could be used against him.

Soon thereafter, an ambulance arrived to take appellant to the hospital. As appellant was lying on a stretcher in the rear of the ambulance, Carter told him that he was not under arrest but orally advised him of his *Miranda* rights. Carter later testified that appellant told him that he understood what Carter was saying.

Appellant was taken to the emergency room at D.C. General Hospital, where he was treated for the gunshot wound to his left leg.[1] Officer Bobby Parker, who had also accompanied appellant to the hospital, remained with him while he was being treated. After receiving a call from his supervisor, Parker arrested appellant for the shooting of the cabdriver. He advised appellant of his rights but did not question him.

Detective Leroy Harris, of the Homicide Branch of the Metropolitan Police Department (MPD), after investigating the crime scene, went to the hospital to interview appellant. When asked what happened to his leg, appellant told Harris that he had been one of two passengers in a cab, that the other passenger pulled out a gun and tried to rob the cabdriver, and that during the ensuing struggle, he was shot, and the other man fled.

Appellant was picked up from the hospital at 8:45 a. m. and was taken to MPD

1. Appellant also complained about pain in his right leg. An x-ray revealed an undisplaced fracture of the lower outside bone of the right leg.

headquarters. He arrived there about 9:30 a. m. and was immediately taken to an interview room and advised of his rights from a PD 47 form.[2] After reading appellant his rights, Detective Harris asked him to answer the waiver questions on the back of the card.[3]

Detective Harris questioned appellant about the shooting, but appellant merely looked at him without saying anything. Harris told appellant that his knife had been found at the scene, and he assumed that since the knife belonged to appellant, the gun did not. Appellant smiled. Harris continued to impress upon appellant "how serious murder was." As Harris spoke, appellant shook his head affirmatively as if to say "I understand," and responded non-verbally to questions but did not speak. After awhile, however, he told Harris he would tell him the truth. He repeated the same story he related at the hospital.

Harris informed appellant that he did not believe the story, advised him to think things over, then left to get appellant a shirt (appellant was bare-chested with noticeable chill bumps), a sandwich and a coke. When he returned, Harris again asked appellant what happened. This time, appellant told him a different story. He said that he and the other passenger, his friend Bongi, had planned to rob the cabdriver.

At this point, appellant executed a waiver of rights at the top of a PD 118 statement form and proceeded to give a three-page

written statement in which he detailed the robbery and the shooting of the cabdriver. When the statement was finished, at about 12:30 p. m.,[4] Harris questioned appellant about the identity and background of his friend Bongi. Upon learning that Bongi came from New York, Harris made a number of phone calls to the New York City Police Department. He continued his efforts to learn more about Bongi until he left work at 3:00 p. m.

Larry Williams, another homicide detective, arrived between 2:00 and 2:30 p. m. and prepared the PD 163 prosecution report of the case. Williams questioned appellant about Bongi, and appellant eventually confessed that he and Bongi had robbed a motel in the area around 14th and Q Streets, Northwest. At about 3:30 p. m., Williams took appellant to the Robbery Branch office down the hall so that the robbery detectives could obtain a more complete statement.

At the Robbery Branch, appellant was interviewed by Detective Charles Dunn. After filling out a PD 47 form, appellant answered questions. With appellant's help, Detective Dunn located the report of the robbery at the Logan Inn. When asked what he knew about the robbery, appellant gave Dunn the details of the crime. He then gave a four-page written statement describing how he and Bongi had robbed the motel. After completion of the statement, sometime after 6:48 p. m., appellant

2. The warnings contained on a PD 47 form are as follows:

You are under arrest. Before we ask you any questions, you must understand what your rights are.

You have the right to remain silent. You are not required to say anything to us at any time or to answer any questions. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning.

If you cannot afford a lawyer and want one, a lawyer will be provided for you.

If you want to answer questions now without a lawyer present you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

3. The waiver questions on the back of the PD 47 are:

Have you read or had read to you the warning as to your rights?
Do you understand these rights?
Do you wish to answer any questions?
Are you willing to answer questions without having an attorney present?

Appellant executed the PD 47 but it was lost; it was not therefore introduced into evidence.

4. Harris began taking appellant's statement at approximately 10:30 a. m. He neglected to fill in the time he actually completed taking the statement, but he estimated that it took approximately two hours to finish completing the statement.

was taken to be fingerprinted and photographed in preparation for presentment in court. Since by this time it was Saturday evening, appellant was not presented until Monday morning.

### B. The Suppression Motions

On December 11, 1978, appellant's counsel filed a motion to suppress statements on the grounds that appellant's waiver of rights was neither knowing nor voluntary since he was in pain and had had neither adequate food nor sleep. At the conclusion of a hearing on February 16, 1979, the trial court held that appellant was properly advised of his rights as required under *Miranda*, that his confessions were freely and voluntarily given and that his physical condition did not affect the voluntariness of his statements.

On July 16, 1979, appellant, represented by new counsel, filed a more extensive motion to suppress on the grounds that appellant had not voluntarily waived his right to remain silent and that his presentment was unnecessarily delayed. After hearing further evidence, on September 21, 1979, the court found that appellant had waived his right to remain silent during questioning. It also ruled that appellant's presentment was not unnecessarily delayed and that the delay did not render his confession inadmissible under Super.Ct.Cr.R. 5(a).

On January 10, 1980, substituted counsel filed yet another motion to suppress. Before the felony-murder trial, appellant was allowed to submit two items of documentary evidence [5] and to make additional arguments in support of his motion. The court again ruled that appellant had been advised of his *Miranda* rights and understood his rights, and that his confessions were voluntarily made.

Appellant's statements were admitted into evidence at his trials for the felony-murder of the cab driver, and separately, for the robbery of the Logan Inn. He was convicted of all charges in both trials, and this appeal followed.

### II

The first issue presented is whether appellant invoked his right to remain silent and, if so, whether the police failed to "scrupulously honor," *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), that right by continuing to "interrogate" him. Appellant argues that although he asserted his right to remain silent, Detective Harris did not cease to interrogate him. Instead, Harris continued to question him for the next thirty minutes until he confessed. He claims that because Harris did not "scrupulously honor" his right to cut off questioning, his statements should have been suppressed.

■ Appellant's argument is premised on the contention that he actually asserted, rather than waived, his right to remain silent. His claim is that his initial lack of verbal response to Harris' questions at the Homicide Branch office was sufficient indication of his intention to remain silent. He relies on *United States v. Hernandez*, 574 F.2d 1362 (5th Cir.1978), as support for this position. We hold to the contrary that appellant's initial silence when first questioned at the Homicide Branch office by Detective Harris did not amount to assertion of his right to remain silent.

Appellant's assertion that he "clearly and effectively maintained to Detective Harris his decision to remain silent" rests on Harris' testimony at the February 16, 1979 suppression hearing. When asked what happened after he gave appellant something to eat, Harris answered:

> Well I advised him of his rights, and then I started asking questions about the crime. I told him that I thought we had a good case against him. And he just looked at me. He wouldn't talk.

This testimony fails to support appellant's contention, however, because at a later hearing on September 21, 1979, Harris explained what he meant when he testified that appellant "wouldn't talk."

---

5. These two items were the x-ray of appellant's right leg showing the fracture and a photo-

graph of appellant at the time of his arrest.

[BY DEFENSE COUNSEL]: And in response to your talking at the time, and part of the talking included your advising him that you thought that you had a good case against him?

A. Yes, I did.

Q. His response was to stand mute?

A. He didn't say anything, he didn't.

Q. He just looked at you and in your own words, February 16, he wouldn't talk, is that correct?

A. I didn't—he answered questions by shaking his head, affirmatively or negatively.

Q. What question did he answer by shaking his head affirmatively at that moment?

A. When I talked to him about the case and finding the knife, okay, he looked at me and smiled. When I told him that he would be a fool to tell me what happened, if he was a shooter, and I assumed that he didn't have the gun, because he had the knife, and that he should help himself, that he could help himself, then he shook his head affirmatively, like I understand what you're saying. But he didn't say anything.

It is apparent from the record that appellant was not refusing to answer questions. He was listening to Harris' questions and communicating his understanding and responses through non-verbal means. Soon thereafter, appellant began telling Detective Harris about the incident, although he did not at first admit the full extent of his involvement. Appellant never asserted his right to remain silent.

The facts of *United States v. Hernandez, supra,* are clearly distinguishable from the case at bar. After his arrest, Hernandez asserted his right to remain silent (as the government conceded in its brief in *Hernandez, id.* at 1368 n.9), and "declined to answer any questions." *Id.* at 1369. Nevertheless, the police applied continuous pressure to induce Hernandez to speak, and he ultimately confessed. On appeal, the Fifth Circuit held that the police had transgressed the limits set in *Miranda,* since Hernandez had "invoked his right to remain silent through his refusals to cooperate." *Id.* at 1368. Here appellant did not invoke his right to remain silent, nor did he refuse to cooperate with the police. He was advised of his rights several times and made oral statements on numerous occasions to Officers Medlock, Carter and Parker, as well as to Detective Harris. Hernandez, on the other hand, repeatedly declined to make any statement to the police before his confession. Moreover, when appellant was interviewed by Detective Harris at the Homicide Branch, he never refused to cooperate. He communicated with Harris first by nodding and then by talking.

Similarly, our recent decision in *United States v. Alexander,* D.C.App., 428 A.2d 42 (1981), is inapposite, for in that case the accused clearly asserted her Fifth Amendment right to counsel, yet the police continued to interrogate her without an attorney present. *Id.* at 45. We held that since Alexander's rights were not scrupulously honored, her ensuing confession was not voluntary for Fifth Amendment purposes. *Id.* at 52. Unlike Alexander, appellant did not assert any of his Fifth Amendment rights. Since appellant never asserted his right to remain silent, the *Michigan v. Mosley, supra,* analysis of whether the police scrupulously honored that right does not come into play. *Cf. Wilson v. United States,* D.C.App., 444 A.2d 25 (1982) (appellant invoked right to remain silent; this court held that police did not scrupulously honor appellant's right of silence).

Because we agree that appellant waived his rights, we must decide whether that waiver was valid. The validity of a waiver of rights "must be determined on the 'particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.'" *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979), quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). In making that determination, the trial court should consider such factors as the defendant's prior experience with the legal system, the circumstances of the ques-

tioning, evidence of coercion or trickery resulting in a confession, and any delay between arrest and confession. *Rosser v. United States,* D.C.App., 313 A.2d 876, 878 (1974). The court's decision that the waiver was valid will not be overturned if it is supported by substantial evidence. *Wilkerson v. United States,* D.C.App., 432 A.2d 730, 734 (1981); *United States v. Alexander, supra* at 49–50.

■ We conclude that there is ample evidence in this record to support the trial court's finding that appellant's waiver of rights was valid. He was repeatedly advised of his rights and acknowledged that he understood them. He had had a number of prior contacts with the criminal justice system and was therefore already familiar with what his rights were. He had been in the Homicide Branch office for only thirty minutes when he admitted that he had been involved in the shooting of the cabdriver. Furthermore, there is no evidence that appellant's confession was produced by police coercion or trickery. Accordingly, the trial court's decision on waiver must be affirmed.

### III

■ The government must prove, by a preponderance of the evidence, that a confession was voluntary. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). In deciding whether a confession was voluntary, the trial court considers the same factors it takes into account in determining the validity of a waiver—the individual's prior experience with the legal system, the circumstances of the questioning, any allegation of coercion or trickery resulting in a confession, and any delay between arrest and confession. *See Rosser v. United States, supra* at 878. Its conclusion that a statement was voluntarily made will not be overturned on appeal unless it is without substantial support in the evidence. *Peoples v. United States,* D.C.App., 395 A.2d 41, 43–44 (1978), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2826, 61 L.Ed.2d 277 (1979). In this context, we consider appellant's contention that his

statements to Detective Harris were involuntary since he was in pain from the gunshot wound, had had little food or sleep, and was told by the police that he could help himself by talking to them.

Appellant had numerous hearings on the issue of the voluntariness of his statements to the police. On February 16, 1979, and again on May 5, 1980, two different trial judges concluded that appellant's statements were voluntary.

On May 5, the court made the following extensive findings:

The issue is whether the statements of Mr. Bliss were freely and voluntarily made in light of the defendant's condition, police actions, and most particularly, the police suggestion that Mr. Bliss might help himself if he told the truth.

The court finds and concludes that Mr. Bliss was advised of his Miranda rights; that he understood those rights. The court, further, finds and concludes that Mr. Bliss was not subjected to any coercive questioning, or to any coercive physical conditions, the court noting that prior to the making of his statement he had been at police headquarters only a brief period of time; his prior time in custody had been in the atmosphere of the hospital where he received treatment for his wounds.

Further, he had food; he had clothing; he had medical attention. The court also finds and concludes that he was not impaired by the ingestation of any drugs, or the administration of drugs in connection with his medical treatment.

The court, further, finds that the statements of the police officer to Mr. Bliss cannot, either by direct or circumstantial evidence, be interpreted as a promise of leniency which caused Mr. Bliss to make these statements involuntarily. The court, in examining the testimony of the police witness, cannot conclude that from the brief suggestion that he might help himself if he told the truth, that the statements flowed therefrom as any part of the promise of leniency on behalf of the Government.

The court concludes that the statements, therefore, were not induced by any improper promise of leniency, and that they were freely and voluntarily made, Mr. Bliss being able—I should say Mr. Bliss understanding his constitutional rights, being competent and freely able to understand them, and there being no coercive circumstances, psychological or physical, which induced the statements and overbore the will of Mr. Bliss.

■ All of the above findings were supported by substantial evidence. Appellant did not complain of pain to the police or indeed to anyone at the hospital. The gunshot wound was a flesh wound; therefore, there was little blood and no need to remove the bullet. He was able to answer questions, even immediately after the shooting, and to walk up stairs. Moreover, appellant admitted that he had been eating (snacking), and had gotten some sleep. Furthermore, appellant never claimed he talked because of any promises of leniency. We therefore affirm the trial court's conclusion that appellant's statements were voluntarily made.

### IV

Appellant contends that his confession to the Logan Inn robbery was inadmissible for two distinct reasons—(1) the confession was obtained by exploitation of the initial illegality committed by the homicide detectives in obtaining the felony-murder confession; and (2) the later confession was a manifestation of the "cat-out-of-the-bag" doctrine. We examine each of these contentions in turn.

#### A. Exploitation of the Initial Illegality

■ The exclusionary rule prohibits the use of illegally obtained evidence, as well as evidence derived through exploitation of the original illegality. See, e.g., Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417–418, 9 L.Ed.2d 441 (1963); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 391–92, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920). Here, however, there was no original illegality. Appellant's confession to the felony-murder of the cabdriver was properly obtained. Several

hours after Detective Harris took his statement, appellant volunteered the information to Detective Williams that he and Bongi robbed the motel near Logan Circle. Thereafter, appellant was taken to the Robbery Branch, where he was interviewed by Detective Dunn. He was advised of his *Miranda* rights and executed another waiver before detailing the robbery. Thus, there was nothing improper about the manner in which his robbery confession was obtained.

#### B. The "Cat-Out-of-the-Bag" Doctrine

Appellant also argues that his confession to the robbery of the Logan Inn should have been suppressed because he "let the cat out of the bag" by confessing to the murder.

■ In *United States v. Bayer*, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), the Supreme Court recognized that when a defendant "has once let the cat out of the bag by confessing," a later confession "may be looked upon as the fruit of the first." *Id.* at 540, 67 S.Ct. at 1398. However, this doctrine applies to the situation where there is a causal relationship between an improperly obtained earlier confession and the later confession. *See Boykins v. United States*, D.C.App., 366 A.2d 133, 136 (1976); *Ruffin v. United States*, D.C.App., 293 A.2d 477, 480 (1972). Moreover, the cat-out-of-the-bag doctrine is applicable only to the admissibility of a second confession that is an "elaboration of the first invalid confession." *United States v. Hackley*, 204 U.S. App.D.C. 221, 230, 636 F.2d 493, 502 (1980). Thus, appellant's argument that his confession to the robbery of the Logan Inn was invalid under the cat-out-of-the-bag doctrine fails on two grounds: (1) his earlier confession was validly obtained; and (2) the robbery confession was not merely an elaboration of the earlier felony-murder confession but was entirely separate from it, concerning distinct offenses. Therefore, since this theory also is inapplicable, appellant's robbery confession was admissible.

### V

Appellant argues that his confession to the Logan Inn robbery, made more than

twelve hours following his arrest, was involuntary. Specifically, he asserts that the failure of the police to promptly present him to the court required the suppression of his robbery confession.

 A confession obtained during a period of unnecessary delay in taking the defendant before the court, in violation of Super.Ct.Cr.R. 5(a) [6] requires that the confession be suppressed. *Mallory v. United States*, 354 U.S. 449, 450–56, 77 S.Ct. 1356, 1360, 1 L.Ed.2d 1479 (1957); *McNabb v. United States*, 318 U.S. 332, 341–45, 63 S.Ct. 608, 613–615, 87 L.Ed. 819 (1943). However, a valid waiver of an individual's *Miranda* rights is also a waiver of his *Mallory* right to presentment without unnecessary delay. *Hawkins v. United States*, D.C.App., 304 A.2d 279, 281 (1973); *Pettyjohn v. United States*, 136 U.S.App.D.C. 69, 419 F.2d 651 (1969), *cert. denied*, 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970). Thus, in this case, by waiving his *Miranda* rights, appellant waived his right to prompt presentment before the court. Since both his felony-murder confession and his robbery confession were made after he waived his

rights, the robbery confession was properly admitted into evidence.

## VI

Finally, appellant contends that the trial court erred in denying his motion for a mistrial based on alleged prosecutorial misconduct.

At trial, appellant repudiated the Logan Inn robbery confession he had made to Detective Dunn, testifying that two of his friends, Smokey and Bongi, had committed the robbery. He claimed that his statement to Dunn was based upon an account of the robbery that he had heard from Smokey and Bongi.

The prosecutor knew that in addition to money and a radio, M&M candies had been taken from the complainant. During cross-examination, the prosecutor asked appellant about the M&M's.[7] There was, in fact, no mention of the M&M's in appellant's statement. Appellant responded that he did not recall having said anything about the M&M's in his statement, so the prosecutor offered to show it to him. The prosecutor then went on to a different line of questioning, however, without giving appellant an

---

6. Super.Ct.Cr.R. 5(a) provides that the arresting officer "shall take the arrested person without unnecessary delay before the court."

7. The actual colloquy was as follows:

 Q. What did Bongi do with those M&M candies that he took?
 A. I don't know what you are talking about.
 Q. Why didn't you want Bongi to take the television, sir?
 A. I don't know what you are talking about.
 Q. And it's your testimony, Mr. Bliss, that as Bongi stood on the corner of 14th and K Street telling you about what he had done,—
 A. I said—Okay, finish your question.
 Q. That he told you about the M&M candies that he took?
 A. Is that my testimony? That while he was on the corner of 14th & K telling me what he was doing, he told me about the M&M candy?
 Q. Yes, sir.
 A. First, I didn't tell you that he was standing on the corner telling me—at 14th and K, telling me about what he had done.
 Q. What corner were you standing on that evening, sir?

A. I told you I was on the corner of 14th and K when they were coming back. That is where he met me at. We went from there to his hotel room. While going over there, they was telling me about the robbery, and how they did it, and how it was easy, how—
 Q. So while you were walking from 14th and K back to the Terminal Hotel, Room 12, that is when he told you about the M&M candies in that statement?
 A. Is there M&M candies in that statement?
 Q. Now, Mr. Bliss, you just told us that everything in this statement was accurate, and you told us that over the last two years you have had many opportunities to review this, sir. Certainly you have seen the portion that deals with the M&M candies; have you not?
 [DEFENSE COUNSEL]: Objection, Your Honor.
 THE WITNESS: Maybe you put M&M candies in there, I didn't see them.
 [BY PROSECUTOR]:
 Q. Would you like to examine this statement?
 A. Yes, I would.

opportunity to examine the statement. At that point, appellant's counsel moved for a mistrial. The motion was denied.

Appellant argues that the credibility of his testimony in the robbery trial depended on the contents of the confession—if the statement was general enough, then the jury could believe that it could be based on someone else's version of the robbery; if it was detailed, then the jury might believe that only one of the perpetrators would have known such information. In the latter case, the jury would be more likely to consider the confession as appellant's personal account of the robbery. Appellant therefore contends that the prosecutor's cross-examination prejudiced his claim that he did not participate in the robbery.

■■■■ The declaration of a mistrial lies within the sound discretion of the trial judge, whose decision will only be disturbed on appeal in extreme circumstances threatening a miscarriage of justice. *Middleton v. United States*, D.C.App., 401 A.2d 109, 127 (1979). The burden is on the movant to show that a mistrial is required and absent an abuse of discretion, the trial court will not be reversed. *Hallman v. United States*, D.C.App., 410 A.2d 215, 217 (1979). At oral argument, the government did not deny that the prosecutor improperly cross-examined appellant. Thus, we must consider whether the error was so prejudicial that it was an abuse of discretion for the trial court to deny the mistrial. The applicable standard for assessing error, as set forth in *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), is:

> [Whether we can say] with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.

*See Smith v. United States*, D.C.App., 392 A.2d 990, 993–94 (1978). "The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Id.* at 993–94, *quoting Smith v. United States*, D.C.App., 315 A.2d 163, 166, *cert. denied sub nom. Jeffries v. United States*, 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974).

■■■ On this record, we conclude that the prosecutor's questions about the M&M's did not prejudice appellant. The questions covered only a small fraction of the extensive cross-examination of appellant. The jury had an opportunity during its deliberations to examine a copy of the statement and thus could see that there was no mention of M&M's. Moreover, Detective Dunn had previously testified on cross-examination that appellant's written statement did not mention the fact that candy was taken during the robbery. Furthermore, the jury was instructed that the questions of counsel were not evidence. Therefore, the trial court's denial of appellant's motion for a mistrial was proper.

*Affirmed.*

NEWMAN, Chief Judge, concurring:

I join fully in the court's opinion and write to add the following note. The conduct of the Assistant United States Attorney, as set forth in part in Section VI of the opinion, was unprofessional and unseemly. Equal justice under law demands more than the government's advocate gave on this occasion.