**Anthony W. BEASLEY, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 84–844.

District of Columbia Court of Appeals.
Argued Dec. 17, 1985.
Decided July 30, 1986.

Neal Kravitz, Public Defender Service, with whom James Klein, Public Defender Service, was on brief, for appellant.

Ellen Bass, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty. and Michael W. Farrell, Asst. U.S. Atty., were on brief, for appellee.

Before PRYOR, Chief Judge, and BEL-SON and TERRY, Associate Judges.

PRYOR, Chief Judge:

Following the merits phase of a bifurcated trial,[1] a jury found appellant, Anthony W. Beasley, guilty of first-degree felony murder (D.C.Code §§ 22–2401, –3202 (1981)); kidnapping while armed (*id.* §§ 22–2101, –3202); armed robbery (*id.* §§ 22–2901, –3202); sodomy (*id.* § 22–3502); second-degree burglary (*id.* § 22–1801(b)); grand larceny (*id.* § 22–2201); unauthorized use of a vehicle (*id.* § 22–2204); carrying a pistol without a license (*id.* § 22–3204); and carrying a dangerous weapon (a knife) (*id.* § 22–3204). On appeal, appellant contends that the confession he made to the police at the time of his arrest should not have been admitted into evidence because the confession was improperly obtained and was involuntary. We do not agree, and accordingly, affirm his convictions.

I

(A) *The Shirley Person Homicide*

In the early morning hours of September 18, 1982, a gunman, later identified as appellant, abducted Shirley Person and her twelve-year-old daughter, Tammy Person, from the parking lot behind an apartment building located at 1330 7th Street, N.W., in which the Persons lived. Ms. Person and Tammy were returning home when the gunman approached Ms. Person's car in the parking lot. The gunman announced a "stick up" and, after jumping into the car, struck Shirley Person on the head with a gun. This caused the gun to "click" and a bullet fell to the car's back floor, hitting Tammy, who was crouched in the back seat.

The gunman drove Ms. Person and Tammy to 22nd Street and T Place, S.E. Along the way, he demanded that Ms. Person give him the rings she was wearing. At some point, the gunman also robbed Ms. Person of approximately $56. When they arrived at 22nd Street and T Place, S.E., the gunman dragged Ms. Person out of the car and forced her to lie on the ground. He then pulled Tammy out of the car and locked her in the trunk.

A struggle ensued between Ms. Person and the gunman. In the course of the struggle, the gunman took out a buck knife and repeatedly stabbed Shirley Person, ultimately cutting her throat. The gunman then removed almost all of Ms. Person's clothes and sodomized her. Leaving Ms. Person lying on the ground, the gunman gathered up her clothes and returned to the car.

The gunman then drove back to Ms. Person's apartment building where, using her key, he entered her apartment and stole certain stereo equipment and two television sets. The gunman was observed by a security guard at approximately 2:00 a.m.

---

1. Prior to trial, appellant notified the court that he intended to rely upon the insanity defense, and requested a bifurcated trial. In an oral ruling on March 22, 1984, the trial judge ordered a bifurcated trial, before a single jury. At the conclusion of the insanity phase, which followed the merits phase of the trial, the jury rejected the insanity defense.

taking stereo equipment from the apartment building to Person's car.[2]

Thereafter, the gunman disposed of the stolen items from the Persons' apartment, and drove the car to the 1300 block of 6th Street, N.W., where he abandoned it. Tammy was still locked in the trunk.

At approximately 5:00 a.m., Metropolitan Police Department (MPD) officers, responding to a report that a woman was screaming inside the trunk of a parked car, found Tammy and freed her. Tammy, who was hysterical, told the police, "He's got my mommy," and proceeded to explain how she and her mother had been abducted. The officers returned with Tammy to the Persons' apartment, where Tammy noticed, and told them, that the stereo equipment and televisions were missing. She also gave the police a picture of her mother.

Two hours later, the police learned that a woman's body had been found in a wooded area across from 22nd Street and T Place, S.E., near Good Hope Road. The body, later identified as that of Shirley Person, was found lying face down with multiple stab wounds in the neck, chest, back and stomach and with evidence of blows to the head. Ms. Person was pronounced dead at the scene.

### (B) *The Arrest, Interrogation, and Confession*

In the months following Shirley Person's homicide, the police uncovered no significant information about her assailant. They were unable to recover fingerprints from the car or the apartment, and could not locate a witness who was able to identify the assailant. Nor was Tammy Person able to make an identification. On February 7, 1983, however, the police linked two unexpended .380 rounds of ammunition, which they had found in Person's car after the murder, with a Sterling .380 semi-automatic pistol recovered from an alley behind appellant's house on November 22, 1982.[3]

On February 16, 1983, at approximately 9:00 a.m., two United States Marshals and two officers of the MPD Special Operations Division arrested appellant for a violation of 18 U.S.C.App.II § 1202(a)(1)—possession of a firearm by a previously convicted felon—pursuant to an arrest warrant issued by the United States District Court. Federal Bureau of Alcohol, Tobacco & Firearms Special Agent Joseph D'Angelillo coordinated the arrest. Also present, but not visible to appellant, was MPD Homicide Detective David Forbes, who was in charge of the investigation into the Person kidnapping and homicide.

Following his arrest, appellant was transported to the homicide branch at MPD Headquarters for questioning. At approximately 9:52 a.m., Detective Forbes and Special Agent D'Angelillo entered the interrogation room where appellant had been placed, introduced themselves, and told appellant that he had been charged in United States District Court with a felony offense relating to his possession of a firearm as a convicted felon. Special Agent D'Angelillo immediately followed these remarks by reading appellant his *Miranda*[4] warnings from a standard PD-47 card.[5] Appellant

---

2. The guard later positively identified appellant, as the person carrying the stereo equipment, from a lineup photograph and in court.

3. The gun had been reported stolen, in July 1982, from a business in Alexandria, Virginia.

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. The PD-47 card contains the following warnings:

 You are under arrest. Before we ask you any questions, you must understand what your rights are.

 You have the right to remain silent. You are not required to say anything to us at any time or to answer any questions. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning.
 If you cannot afford a lawyer and want one, a lawyer will be provided for you.
 If you want to answer questions now without a lawyer present you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

signed the PD–47 card, and indicated that he was willing to answer questions without an attorney being present.

In response to D'Angelillo's questions about the gun, appellant admitted stealing the gun on July 29, 1982, from a parked car, transporting the firearm into the District of Columbia, and maintaining sole possession of the gun up until the time it was recovered by the MPD in November 1982.

Forbes then began questioning appellant about the Person homicide. Appellant initially denied any knowledge of the events surrounding Shirley Person's homicide. Detective Forbes continued to question appellant about the homicide, and proceeded to mislead appellant about the strength of the evidence against him. Thus, Forbes told appellant, untruthfully, that both Tammy and the building superintendent had positively identified appellant as the perpetrator, and that three or four other people had seen appellant remove the stereo equipment from the Persons' apartment. Forbes also told appellant, again untruthfully, that appellant's fingerprints had been removed from Ms. Person's car with the use of lasers. He represented to appellant that appellant's potential sentence would likely be lowered if appellant confessed. Both Forbes and D'Angelillo also offered to "talk" to the United States Attorney's Office if appellant cooperated.

Approximately twenty minutes into the officers' questioning of appellant, Lieutenant William Ritchie of the homicide branch turned on a videotape camera and began recording the interrogation. Before beginning the videotaping, Ritchie had called Forbes out of the interrogation room and told him that the interview would be taped; appellant, however, was not told that the videotaping was taking place. At the outset of the videotaping, Forbes re-advised appellant of all his *Miranda* rights by re-reading the PD–47 rights card. Appellant acknowledged that he had signed the waiver card and indicated orally that he understood his rights. Forbes also re-advised appellant that he was under arrest, and appellant responded that he understood.

Over approximately the next hour, appellant continued to deny his involvement in the crime. He also began to give conflicting versions of what had transpired on the night in question. Thus, he explained the alleged presence of his fingerprints in Ms. Person's car by claiming that on the night of the incident he was walking to a friend's apartment when he passed a parked car and heard the voice of a little girl crying "help, help." He claimed that he told "someone" to call the police and then attempted to open the trunk by locating the remote release button in the car's glove compartment. When he still could not open the trunk, he went home to get a screwdriver. By the time he returned, paramedics and police were on the scene and had already freed the little girl.

Detective Forbes, in turn, continued to dispute appellant's version of the events and advised appellant that appellant had to "tell the truth." Forbes also told appellant, untruthfully, that when appellant hit Shirley Person over the head with the gun, blood was left on the gun. The detective also repeated his earlier statements that Tammy could identify appellant as the man who abducted her and her mother. Appellant then changed his story and claimed that on the night of September 18, someone named "Butch" had admitted killing "a girl" and placing a child in a trunk. Appellant contended that Butch had asked him to move stereo equipment from the Persons' apartment to a car in the parking lot.

At intervals, Forbes and D'Angelillo interrupted the interview to get appellant a

---

The waiver questions on the back of the PD–47 card are:
 Have you read or had read to you the warnings as to your rights?
 Do you understand these rights?
 Do you wish to answer any questions?

Are you willing to answer questions without having an attorney present?
According to undisputed testimony in the record, appellant answered "yes" in writing to all four questions on the card.

soda or cigarettes, to accompany appellant to the bathroom, or to adjust appellant's handcuffs.[6] According to the interrogating officers' testimony at the pretrial hearing, at no time during the interrogation did appellant complain of feeling ill or being in pain. Nor did appellant appear to be intoxicated by alcohol or drugs.

A turning point in the questioning occurred at approximately 11:30 a.m., when appellant asked to speak with Officer Joseph T. McCann, a detective he had known since 1974 or 1975, when McCann arrested appellant for a burglary. Forbes and D'Angelillo left the room and informed McCann that appellant wished to speak with him. They also told McCann that appellant was a suspect in the Person homicide investigation. Around this time, the videotape camera and recorder were turned off.

McCann proceeded to speak with appellant for about twenty minutes. He urged appellant to "tell the truth" about the homicide. Appellant, in turn, told McCann that he wanted to "tell him about it." After McCann informed him that appellant was prepared to confess, Forbes re-entered the interrogation room and the videotape recorder and camera were re-started. At approximately twelve noon, McCann gave incomplete *Miranda* warnings to appellant,[7] showed appellant the PD–47 card and confirmed with appellant that appellant had signed it. Appellant indicated for the third time that morning that he understood his rights. He also stated that he now was willing to give a statement. Appellant then made a full confession in which he admitted that he had abducted Shirley Person and Tammy Person for the purpose of robbing them; that he then had repeatedly stabbed Shirley Person because he realized that she had seen his face and he was scared that "she might call the police"; that he had returned to the Persons' apartment to steal the stereo equipment and

televisions; and that he then abandoned Ms. Person's car with Tammy still locked in the trunk. The questioning and confession concluded at 12:30 p.m., at which time appellant was charged with the murder of Shirley Person.

Prior to trial, appellant moved to have his confession suppressed at trial on the grounds that he had not "knowingly and intelligently" waived his rights to remain silent and have counsel present during questioning and that his statement was involuntary because it was the product of police trickery and deception. Appellant claimed that during the interrogation on February 16, he was severely beaten by the police officers conducting the interview, and that he confessed to the Person murder only in order to avoid being beaten further. He also maintained that at the time of his arrest he was under the influence of drugs and alcohol.

After holding a hearing on the motion to suppress, and viewing the videotapes of the interrogation and confession, the trial court denied the motion, ruling that the statements "were voluntarily made," and "that there was no trickery on the part of the police to get the [d]efendant to make an untrue statement." The trial court also specifically disbelieved appellant's testimony concerning physical abuse during the interrogation process. The confession was admitted at trial and appellant was convicted as charged.

## II

### (A) *Miranda Waiver*

The first question presented for our consideration is whether appellant executed a valid waiver of his rights to remain silent and have counsel present during questioning when he answered and signed the PD–47 card at approximately 10:00 a.m. Specifically, the issue here is whether a suspect's valid waiver of his right to silence

---

**6.** Earlier, appellant had been allowed to telephone his wife from the police station.

**7.** McCann omitted telling appellant that if appellant could not afford an attorney one would be appointed for him.

and right to counsel necessarily requires that the suspect be aware prior to any interrogation of all possible subjects of that interrogation.

We begin our analysis by noting that the government bears a "heavy burden ... to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). In order to be legally sufficient, a waiver of any fundamental constitutional right must be "an intentional relinquishment of a known right or privilege," *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), performed with "sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747 (1970).

Appellant concedes that following his arrest and prior to the commencement of any interrogation Special Agent D'Angelillo read appellant the complete litany of *Miranda* warnings. Appellant also does not dispute that he understood what his rights were when he answered "yes" next to the four questions printed on the PD–47 card, thereby indicating that he waived his rights to remain silent and to have counsel present during questioning.[8] He argues, however, that in order for a waiver to be "knowing and intelligent," the police, in addition to administering the warnings expressly mandated by *Miranda*, must also inform a suspect of all possible crimes which they are investigating. In the instant case, prior to executing his written waiver on the PD–47 card, appellant was informed that he was under arrest for possession of a gun, but was not told at the time that he was a suspect in a homicide investigation. As a result, appellant asserts the waiver was not effective with respect to his statement about the homicide.

A number of courts have considered the validity of a suspect's waiver following *Miranda* warnings, where prior to the waiver, the police either did not fully inform the suspect of the crime under investigation or told the suspect that he or she would be questioned about a particular crime and then switched the subject of the interview to other criminal activity of which the person in custody was also suspected. *See, e.g., Carter v. Garrison*, 656 F.2d 68 (4th Cir.1981), *cert. denied*, 455 U.S. 952, 102 S.Ct. 1458, 71 L.Ed.2d 668 (1982); *United States v. McCrary*, 643 F.2d 323 (5th Cir. 1981); *United States v. Anderson*, 175 U.S.App.D.C. 75, 533 F.2d 1210 (1976); *Collins v. Brierly*, 492 F.2d 735 (3d Cir.), *cert. denied*, 419 U.S. 877, 95 S.Ct. 140, 42 L.Ed.2d 116 (1974); *United States v. Campbell*, 431 F.2d 97 (9th Cir.1970); *State v. Caouette*, 446 A.2d 1120 (Me.1982); *State v. Carter*, 296 N.C. 344, 250 S.E.2d 263, *cert. denied*, 441 U.S. 964, 99 S.Ct. 2413, 60 L.Ed.2d 1070 (1979); *State v. Goff*, 169 W.Va. 778, 289 S.E.2d 473 (1982). While some courts have expressed doubt that a suspect's waiver of the rights to remain silent and to counsel can be knowing, intelligent, and voluntary where the suspect is either not informed of, or deceived as to, the offense under investigation, *see, e.g., United States v. McCrary, supra*, 643 F.2d at 328; *Collins v. Brierly, supra*, 492 F.2d at 739; *Schenk v. Ellsworth*, 293 F.Supp. 26, 29 (D.Mont.1968), most courts have viewed the issue of what information the police give a suspect prior to questioning as only one factor which the trial court must consider in the totality of the circumstances calculus of determining voluntariness. *See United States v. Burger*, 728 F.2d 140, 141 (2d Cir.1984); *Carter v. Garrison, supra*, 656 F.2d at 70; *United*

8. Appellant maintained in his pretrial motion that he was intoxicated with drugs and alcohol at the time of his arrest and interrogation. Notwithstanding this claim, however, appellant testified at the pretrial hearing that he understood what his rights were and was in control of his faculties during the interrogation. The trial judge obviously disbelieved the intoxication claim in denying appellant's motion. In any event, appellant does not pursue this argument on appeal.

*States v. Anderson, supra,* 533 F.2d at 1212 n. 3; *People v. Spring,* 713 P.2d 865, 873–74 (Colo.1985), *cert. granted in part,* —— U.S. ——, 106 S.Ct. 1961, 90 L.Ed.2d 368 (1986); *State v. Goff,* 289 S.E.2d at 477. Few courts have been willing to establish an absolute rule that a waiver of rights following *Miranda* warnings can never be valid when the suspect is not fully informed, before questioning begins, of the criminal activity constituting the subject of the investigation. *See, e.g., United States v. Poole,* 161 U.S.App.D.C. 289, 293 n. 5, 495 F.2d 115, 119 n. 5 (1974) (once suspect is fully warned of his rights to counsel and to keep silent, police are not obligated to rewarn suspect when subject of questioning shifts from one criminal activity to another), *cert. denied,* 422 U.S. 1048, 95 S.Ct. 2667, 45 L.Ed.2d 701 (1975).

We believe that the better approach, and the one more consistent with our previous decisions concerning the standards governing the validity of waivers in these circumstances, is to consider the extent of the suspect's understanding of the thrust of the interrogation as only one factor in the totality of the circumstances surrounding the making of a confession. *See, e.g., McClinnahan v. United States,* 454 A.2d 1340, 1346 (D.C.1982) (validity of waiver must be assessed under the totality of the circumstances); *Hawkins v. United States,* 304 A.2d 279, 281 (D.C.1973) (same). The fact that a suspect may not have known the precise nature of the charges under investigation "does not lead inevitably to the conclusion that his waiver was other than knowing." *United States v. Anderson, supra,* 533 F.2d at 1212 n. 3. The *Miranda* decision itself does not require police officers to inform a suspect at the outset of the exact scope of criminal activity which they are investigating. More importantly, a written or other form of waiver following *Miranda* warnings does not compel a suspect to answer all questions presented by the police. Rather, the warnings expressly advise that the suspect is free to stop answering questions at anytime. *See McClinnahan v. United States, supra,* 454 A.2d at 1346 (arrestee's right to cut off questioning is "critical safeguard" provided by *Miranda* warnings). Thus, for example, the suspect can choose to stop talking when the questioning shifts from one alleged criminal act to another. *See United States v. Burger, supra,* 728 F.2d at 141. Moreover, the police, at the time of arrest, often cannot assess the full scope of criminal activity under investigation until the interrogation is underway. As the Second Circuit recently stated in this regard:

> Adoption of [an] ... inflexible rule ... would severely hamper the efforts of law enforcement officers, who often do not know what laws have been violated until they have completed their investigation.

*Id.* at 141. In short, we decline to adopt an absolute rule which automatically renders invalid any waiver made in a situation where the police failed initially to inform the suspect of all the crimes being investigated, as part of the *Miranda* warnings.

In determining whether a waiver is voluntary under the totality of the circumstances, the generally accepted list of factors which the trial court must consider includes "the defendant's prior experience with the legal system, the circumstances of the questioning, evidence of coercion or trickery resulting in a confession, and any delay between arrest and confession." *Bliss v. United States,* 445 A.2d 625, 631 (D.C.), *amended,* 452 A.2d 172 (1982), *cert. denied,* 459 U.S. 117, 103 S.Ct. 756, 74 L.Ed.2d 972 (1983); *see Rosser v. United States,* 313 A.2d 876 (D.C.1974). Other important factors are the suspect's age and level of education, and whether the suspect was ill, injured, under the influence of drugs or alcohol, or mentally infirm. *See Jackson v. United States,* 404 A.2d 911, 924 (D.C.1979); *In re D.A.S.,* 391 A.2d 255, 258 (D.C.1978).

Applying these factors to the instant case, we conclude that the trial court did not err in finding appellant's waiver knowing, intelligent, and voluntary under

the totality of the circumstances. Appellant was a twenty-five-year-old adult with an eleventh grade education and a long history of experience with the criminal justice system dating back to a burglary arrest and conviction in 1975.[9] Appellant was able to read and write and admitted that he had been advised of his rights previously with respect to other crimes. At the time of his arrest, appellant did not exhibit any signs of mental illness or alcohol or drug intoxication. Both Forbes and D'Angelillo testified that appellant appeared rational and calm during the arrest and interrogation and did not complain of feeling ill. Upon arriving at the police station, appellant was permitted to telephone his wife, and though he was handcuffed in the interrogation room, the officers repeatedly offered to adjust the handcuffs to make him more comfortable. Moreover, the interrogation commenced within an hour following appellant's arrest and concluded a few hours later. In sum, appellant well understood both his rights and police procedures prior to executing his written waiver.

Against this background, we examine the fact that the police did not expressly inform appellant, prior to his waiver, that he was a suspect in the Shirley Person homicide. On the basis of the record before us, we cannot say that because appellant did not know the precise scope of the charges under investigation, his waiver was not knowing or voluntary.

Detective Forbes first raised the subject of the homicide after appellant confessed to stealing the .380 Sterling pistol, approximately a half-hour after appellant was given full *Miranda* warnings and executed the written waiver. Immediately upon switching the subject from the gun to the homicide, Detective Forbes made clear to appellant that appellant was a prime suspect in the homicide. Forbes did not ask vague or deceptive questions in an attempt to mislead appellant about the subject matter of the interrogation. Shortly thereafter, Forbes recited all of the *Miranda* warnings a second time to appellant, and appellant acknowledged that he understood what his rights were and had waived those rights.[10] The recitation of fresh warnings at this juncture was a pointed indication that the subject matter of the interrogation was shifting, and militates against the argument that the police were trying to deceive appellant about the thrust of their investigation. In short, prior to making any statement, appellant was fully aware that the subject of the police interview was the Shirley Person homicide, and that he had the right, among other things, to stop answering questions at any time. *See Collins v. Brierly, supra,* 402 F.2d at 739 ("waiver" does not occur until suspect actually answers questions notwithstanding suspect's earlier signing of a written waiver form).

Additionally, the two offenses—the gun charge and the homicide—were not wholly unrelated. *Compare United States v.*

9. The extent of appellant's familiarity with police procedures was illustrated by his testimony at the pretrial hearing that he was acquainted with certain techniques the police used during interrogation such as a "Mutt and Jeff" routine.

10. Appellant now argues that any oral waiver made subsequent to the first written waiver was invalid because it was induced by the misleading statements Detective Forbes made concerning the strength of the evidence against appellant.

For reasons discussed in Part B, *infra,* we agree with the trial court's conclusion that appellant's statements were not the product of deception or trickery. We mention these subsequent warnings here only to emphasize that after appellant was put on notice that he was a suspect in the Shirley Person murder, and before he made any statements at all in reference to the homicide, the police reminded appellant more than once that he could refuse to speak, or stop speaking at any time. We observe that at no time, following his written waiver, did appellant refuse to speak with the police or request the assistance of a lawyer. His oral waivers of his rights to silence and to counsel suggest, at a minimum, that he would have proceeded along the same course had he been told at the outset that he was under arrest for the Person homicide.

*McCrary, supra,* 643 F.2d at 329. There was strong circumstantial evidence indicating that the pistol that led to appellant's arrest was the same gun used in the Person kidnapping and homicide. Thus, after appellant readily admitted possessing and being in sole custody of the pistol at the time of the Person homicide, Forbes explained to appellant that bullets found in Shirley Person's car were traced to that same pistol, thereby linking appellant to the Person homicide. Under these circumstances and especially in light of appellant's age, education, and prior experience with the criminal justice system, we cannot say that appellant was without any basis for suspecting that he might be questioned about the murder, although he was arrested on the gun charge. *See generally Lewis v. United States,* 483 A.2d 1125, 1131 n. 7 (D.C.1984). In any event, appellant clearly understood the thrust of the interrogation when he gave his confession.

This is not to say that a situation could not arise where, because the police fail to inform a suspect prior to *Miranda* warnings and questioning of the subject matter under investigation, a subsequent confession is rendered inadmissible. Nevertheless, in the instant case we do not believe the interrogation method employed by the police rendered appellant's waiver invalid. In sum, we reject appellant's contention that the initial warnings which the police gave to appellant were not adequate to produce a knowing, intelligent and voluntary waiver of his rights to remain silent and to counsel.

#### (B) *Voluntariness of Confession*

Appellant argues in the alternative that even if his waiver following the first *Miranda* warnings was valid, his subsequent statement should not have been admitted because it was not voluntary under the totality of the circumstances. He claims that when he finally confessed to Forbes and McCann, he did so only in response to psychological coercion, namely, his interrogators' promises of leniency and their deceptions about the strength of the government's evidence.

In determining whether, under the totality of the circumstances, a confession is voluntary, the trial court should consider the same factors it takes into account in determining the validity of a waiver following *Miranda* warnings. *Bliss v. United States, supra,* 445 A.2d at 631. As stated above, these factors include: age, education, prior experience with the legal system, circumstances and duration of the questioning, and any allegations of physical coercion, trickery, or promises of leniency. *See id.*

In ruling on appellant's pretrial motion to suppress, the trial court rejected the claims of both psychological and physical coercion. The trial court found *inter alia:*

> [T]he Defendant throughout the questioning denied emphatically any part to play in the crime which the detectives were attempting ... by trickery to ... get him to confess. The only time that the Defendant made statements pertinent to the case at hand must be classified by this Court as unrestrained [and by the defendant's] ... own choosing, notwithstanding [the defendant's] testimony ... that he was beaten....
>
> The Court having listened to the tape and having heard the testimony rules that the ... statements ... were voluntarily made ... and that there was no trickery on the part of the police to get the Defendant to make an untrue statement.

Upon reviewing the record, including viewing firsthand the videotape of the interrogation and confession, we agree with the trial court's conclusions in this regard.

 The use of deception or trickery by the police during an interrogation, while subject to close scrutiny, does not in and of itself render an otherwise voluntary confession invalid. *In re D.A.S., supra,* 391 A.2d at 256. Accordingly, "[c]onfessions generally are not vitiated when they are obtained by deception or trickery, as long as the means employed are not calculated to pro-

duce an untrue statement." *Id.* at 258. Similarly, any alleged promises by the police of leniency in exchange for a confession must be viewed by the trial court under the totality of all the surrounding circumstances to determine whether they were sufficient to "overbear [the suspect's] free will." *United States v. Robinson,* 222 U.S.App.D.C. 282, 289, 698 F.2d 448, 455 (1983). Applying these standards to this case, we believe appellant's statement was voluntary.

■ With respect to police promises of leniency, appellant complains that Forbes made misleading promises such as suggesting that the kidnapping charge might be dropped and that appellant might be able to plead guilty to second-degree murder if he "told the truth." [11] As appellant concedes, however, Forbes, D'Angelillo, and McCann repeatedly stressed to appellant that all they could really do was report his cooperation to the United States Attorney's Office. Thus, the officers told appellant that he should "help himself" and "tell the truth" and that any cooperation would be communicated to the prosecutor. We do not believe that remarks of this nature under these circumstances were "sufficiently critical" to have overborne appellant's ability to make a free and voluntary confession. *See United States v. Robinson, supra,* 222 U.S.App.D.C. at 289, 698 F.2d at 455; *compare Grades v. Boles,* 398 F.2d 409, 412 (4th Cir.1968) (involving promises of leniency made by prosecutor as opposed to police officers).

■ Similarly, the officers repeated a number of misleading statements to appellant concerning the strength of the evidence against him. These comments included falsely telling appellant that his fingerprints had been found in the Decedent's car, and that Tammy Person, and at least one other witness, could identify appellant as the assailant. We think it is beyond dispute that these remarks were intended to cause appellant to believe that he might as well confess because the weight of the evidence against him was overwhelming. Nor can we say with certainty that such statements had *no* effect whatsoever on appellant's state of mind. Nevertheless, we believe that appellant's own behavior during the interrogation indicates that the officers' statements were not sufficient to coerce a false confession.

Notwithstanding Forbes' assertions, appellant steadfastly denied any involvement in the Person kidnapping and homicide. For over one hour appellant adhered to his story that a man named "Butch" had committed the crime, and had "set up" appellant. Indeed, at the pretrial hearing, appellant never claimed that he was influenced by the officers' statements about the allegedly incriminatory evidence they had uncovered. Rather, appellant maintained that the only reason he confessed was because of "the beating" the police had given him—a claim the trial court wholly rejected. It was only after appellant, on his own initiative, requested to speak with Officer McCann that appellant decided to confess to the crime. The record indicates that during their conversation, Officer McCann did nothing more than advise appellant "to tell the truth."

In sum, we do not condone certain of the tactics used by the police in this case, and such tactics have made this a close case. Yet, we are satisfied that the totality of the circumstances supports the trial court's finding of voluntariness. Accordingly, finding no error,[12] appellant's convictions are

*Affirmed.*

11. The officers were without authority to determine what if any charges would be brought against appellant.

12. Appellant's final contention is that the trial court erred in refusing appellant's request that the jury not be instructed according to Criminal Jury Instructions for the District of Columbia, No. 5.11 (3d ed. 1978).

Instruction No. 5.11 informs the jury that a person acquitted by reason of insanity is entitled to a hearing within 50 days of commitment to determine whether the acquittee is entitled to release from custody. During the insanity

phase of his trial, appellant sought to voluntarily waive the 50-day hearing and, on that basis, argued that Instruction 5.11 was not relevant and should not be given. The trial court rejected appellant's argument and gave Instruction 5.11 as written. We find no abuse of discretion.

*See Adams v. United States,* 502 A.2d 1011, 1025 n. 20 (D.C.1986) (holding that decisions respecting so-called *Bolton* hearings are matters committed to the sole discretion of the trial court and will not be reversed absent abuse).