**Patrick Di GIOVANNI, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 99–CF–93.

District of Columbia Court of Appeals.

Argued Sept. 12, 2000.
Decided Nov. 21, 2002.

---

Brett E. Cohen, Arlington, VA, for appellant.

1. D.C.Code § 22–501, –3202 (1996 Repl.).

2. D.C.Code § 22–504.1, –3202 (1996 Repl.).

3. D.C.Code § 22–3204(b) (1996 Repl.).

4. D.C.Code § 22–3204(a) (1996 Repl.).

5. D.C.Code § 6–2311(a) (1995 Repl.).

Patricia Sulzbach, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Mary–Patrice Brown, and James Sweeney, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, RUIZ and WASHINGTON, Associate Judges.

WASHINGTON, Associate Judge.

Appellant, Patrick Di Giovanni, was convicted of assault with the intent to kill while armed,[1] aggravated assault while armed,[2] possession of a firearm during the commission of a crime of violence or dangerous offense,[3] carrying a pistol without a license,[4] possession of an unregistered firearm,[5] unlawful possession of ammunition,[6] and possession of a prohibited weapon.[7] Di Giovanni filed a timely notice of appeal to this court, arguing that the trial court erred by 1) denying his pretrial motion to suppress his statements; 2) denying his motion for judgment of acquittal pertaining to the charge of assault with the intent to kill while armed; 3) ruling that his character witness could be cross-examined about his awareness of appellant's prior arrest for assault with the intent to kill; and 4) providing the jury with a standard flight instruction. We reverse and remand based on Di Giovanni's first claim of error.

## I.

On the evening of November 13, 1996, James Grace ("Grace") parked his car near M Street. After eating at Burger King, he walked through P Street Beach[8] and

6. D.C.Code § 6–2361(3) (1995 Repl.).

7. D.C.Code § 22–3214(a) (1996 Repl.).

8. Grace testified that "P Street Beach" is the area of Rock Creek Park between M Street and P Street, Northwest, in Washington, D.C. He testified that this section of the park was a

stopped at the top of a path to smoke a cigarette. Di Giovanni approached Grace, said hello, and walked away. Di Giovanni then approached Grace again, asked Grace his name, and asked if Grace wanted him to perform fellatio on him. Although Grace did not inform Di Giovanni of his name, he agreed to receive oral sex. Di Giovanni began performing fellatio on Grace, but stopped abruptly after one minute, saying "I hear someone calling me." Di Giovanni then took a gun from his right pocket, placed a white cloth over his hand and began shooting. A bullet hit Grace's stomach, causing him to dive down a cliff and hit a tree. Di Giovanni continued shooting at Grace while Grace struggled to reach his car.

Officer Harold E. Cunningham, Jr., of the Metropolitan Police Department ("MPD"), heard the gunshots and reported them on his radio. Grace noticed a police car and immediately told the police that he had been shot. He then fell to the ground, and a "spent slug" from a fired bullet tumbled from his clothing and landed on the ground beside him. MPD Detective Hughe Carew recovered the slug.

MPD Sergeant Timothy Cortright responded to Officer Cunningham's radio call and successfully obtained a description of Grace's assailant from Grace. MPD Officer Todd Arechiga also responded to the call and found Di Giovanni lying on the grass next to the roadway in Rock Creek Park. Di Giovanni's clothing was wet and he was curled into a fetal position. Officer Arechiga testified that Di Giovanni told him three times that "[t]here's a man up there with a gun." Sergeant Cortright then appeared and determined that Di Giovanni matched Grace's description of his assailant. Di Giovanni was handcuffed and identified by Grace as the individual who shot him before being taken to the hospital by ambulance.

Di Giovanni was taken to the police station for interrogation, where he was handcuffed to a chair in the detective's room. Sergeant Cortright advised Di Giovanni of his rights and asked Di Giovanni if he understood them. Sergeant Cortright testified that when Di Giovanni replied that he did not fully understand the warnings, Sergeant Cortright repeated them "line by line, reading each line very slowly [and] making sure [Di Giovanni] was paying full attention" because Di Giovanni appeared "like he was possibly very slow." After confirming that appellant understood the warnings, Sergeant Cortright reviewed the waiver questions "one by one and made sure [Di Giovanni] understood each [one]." When Sergeant Cortright read question three, which states, "Are you willing to answer any questions," Di Giovanni asked whether he had to speak to the police, to which Sergeant Cortright answered, "No, you don't have to say anything to me at this time." When Sergeant Cortright read question four, which states, "Are you willing to answer questions without having an attorney present," Di Giovanni asked Sergeant Cortright whether he needed a lawyer at that point in time. Sergeant Cortright responded that he would need one later, but that at that time he did not think Di Giovanni needed one, and that it would not be feasible to bring a lawyer into the police station. Sergeant Cortright told Di Giovanni that if Di Giovanni said he wanted a lawyer, Sergeant Cortright would stop questioning him, but that "it would be best if [Di Giovanni] told [his] side of the story." Sergeant Cortright stated that because Di Giovanni was shaking from being wet and cold, he had to fill in the waiver of rights form for Di Giovanni, and Di Giovanni only signed his name.

After signing the form, Di Giovanni gave his side of the story to Sergeant Cortright.

predominantly gay area, where people go for "friendship or a sexual purpose."

Di Giovanni first contended that a large white man had tried to talk to him on the P Street Bridge and then, for no reason, began to fire shots at him. When Sergeant Cortright showed disbelief at this version of events, Di Giovanni changed his story. Di Giovanni then stated that he had been approached by two black men. He stated that when he attempted to run away, the men chased him. One of them then grabbed him by the neck and asked if he was "afraid of black guys." Di Giovanni said he then fired several shots from his gun, removed the clip, reloaded and fired again. He stated that he had purchased the gun for protection and that it was registered in Maryland.

After Sergeant Cortright finished interviewing Di Giovanni, Detective Carew was brought in to take Di Giovanni's written statement. Detective Carew re-advised Di Giovanni of his rights before taking his statement. Following his statement, Di Giovanni led the officers to the location of the gun and ammunition, which were recovered that evening. The gun was later determined to be registered to him in Maryland. The bullet and casings discovered on the ground in P Street Beach and the bullet recovered from Grace's clothing were found to have come from Di Giovanni's gun.

## II.

Di Giovanni argues that the trial court committed reversible error by denying his motion to suppress statements made to Sergeant Cortright because he did not properly waive his right to counsel under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Di Giovanni contends that because Sergeant Cortright inappropriately continued to interrogate him after he inquired about advice of counsel, his statements made after this inquiry should have been suppressed by the trial court.

 When reviewing a challenge to the denial of a motion to suppress, this court defers to the trial court's findings of fact and all inferences derived therefrom unless they are clearly erroneous. *See Anderson v. United States,* 658 A.2d 1036, 1038 (D.C.1995); *Lawrence v. United States,* 566 A.2d 57, 60 (D.C.1989). This court must "view the record in the light most favorable to the party that prevailed in the trial court [and] must sustain any reasonable inference that the trial judge has drawn from the evidence." *Morris v. United States,* 728 A.2d 1210, 1215 (D.C. 1999) (citation omitted). The "trial court's underlying factual findings ... are reviewed under the 'clearly erroneous' standard," and will be set aside only if they lack substantial support in the record. *Id.*

"In *Miranda,* the Supreme Court established that statements made by an accused while in police custody are inadmissible ... unless the police prior to questioning, warn him that he ' ... has the right to the presence of an attorney ....'" *In re M.A.C.,* 761 A.2d 32, 35 (D.C.2000) (citations omitted). The Supreme Court has articulated that, when evaluating a *Miranda* warning, "the inquiry is ... whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda,*'" including the right to consult with an attorney before and during his interrogation and the right to terminate his questioning at any time until he speaks with an attorney. *Morris,* 728 A.2d at 1215.[9]

---

9. The Supreme Court has articulated that the existence of an express waiver provides strong support for a conclusion that the defendant validly waived his rights. *See North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) ("[an] express waiver or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of the waiver.").

Though the accused may waive his rights provided by *Miranda* and provide a statement to the police, *see In re M.A.C.*, 761 at 36, "[w]hen a defendant challenges the admissibility of such. a statement, the government has the burden of proving that the waivers of privilege against self-incrimination and the. right to counsel were made knowingly, intelligently, and voluntarily." *Id.* (citations omitted). The government must demonstrate that the defendant is warned and understands the basic touchstones of *Miranda*, including his right to an attorney. *See United States v. Yunis*, 273 U.S.App. D.C. 290, 301, 859 F.2d 953, 964 (1988). Thus, the government "bears a heavy burden to show: (a) that the defendant understood that in fact he had a right to the presence of counsel during an interrogation, . . . and (b) that the defendant intentionally relinquished or abandoned that 'known right.' " *Shreeves v. United States*, 395 A.2d 774, 778 (D.C.1978).

In order to determine whether Di Giovanni's waiver of his *Miranda* rights was made knowingly, intelligently, and voluntarily, we must examine "the particular facts and circumstances surrounding that [his] case" *see Edwards v. Arizona*, 451 U.S. 477, 480, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and the totality of the circumstances. *See In re M.A.C.*, 761 A.2d at 36. Among other factors, the trial court should consider "the defendant's prior experience with the legal system, the circumstances of the questioning, evidence of coercion or trickery resulting in a confession, and any delay between arrest and confession." *Bliss v. United States*, 445 A.2d 625, *modified on other grounds*, 452 A.2d 172 (D.C. 1982). In addition, it is appropriate for a court to consider the intellectual capacity and education of the accused, *see Sims v. Georgia*, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967). However, "a low I.Q., standing alone, will not render an other-wise voluntary and knowing confession inadmissible." *In re M.A.C.*, 761 A.2d at 38.

The trial court's consideration of these factors led it to conclude that a valid waiver had been executed. Relying on *Yunis*, the trial court noted that it was "[n]ot looking to see if Mr. Di Giovanni made a wise decision but rather whether he made a knowing and intelligent decision knowing the meaning of his rights in their common sense." The trial court properly accorded little weight to Di Giovanni's prior experience with the legal system, as he had only been given *Miranda* warnings a single time when he was arrested seven years prior to his arrest in this case and because it was clear from the record that Di Giovanni had some memory difficulties. However, the trial court did find that while Di Giovanni may have had limited intellectual capacity and memory problems, he "could make some significant decisions," noting, among other things, that he made discriminating responses (as noted in the officer's PD 118 form) and that when "he was able to think up . . . a ploy . . . and that kind of thinking was revealing of his intellectual capacity." Moreover, the trial court found little delay between arrest and questioning, no evidence of coercion or trickery, and although it was troubled by Di Giovanni's cold, wet and shivering condition, noted that the officers offered him coffee and a change of clothing which was rejected, and that it was warm inside the police station.

While the trial court is essentially correct that a knowing and intelligent waiver does not necessitate an understanding of the tactical advantages of having an attorney present or otherwise invoking *Miranda* rights, in light of the fact that Di Giovanni was initially misinformed and confused as to what those rights were, his waiver did not meet the knowing and intelligent standard. Specifically, after review-

ing Sergeant Cortright's testimony, we conclude that the government has fallen short of meeting its burden. In his testimony, Sergeant Cortright states in pertinent part:

A. He appeared to me like he was possibly very slow, maybe things we were saying to him didn't quite sink in, so I took it one step further and tried to explain things in detail, great detail to him, to make sure he understood fully.

A. The best I can recall he was asking me did he have to talk to me and I said no, you don't have to say anything to me at this time. And he was asking about a lawyer and I said a lawyer was not going to be offered to you at this point in time. Later on in court you will be appointed a lawyer but for this proceeding right now, my interview, we were not going to go out and get a lawyer and bring him in and let him sit down and talk with us. I made sure he understood everything.

Q. You told him he didn't [need a lawyer]?·

A. I told him he would need one later. I told him at this point in time I didn't think he would need one, it wouldn't be feasible for us to call a lawyer and bring him in here and basically you can answer the questions yes or no.

In addition, Sergeant Cortright testified to the following:

Q. At what point did you think that Mr. Di Giovanni was having difficulty understanding you?

A. I started reading the Rights card to him and he looked at me kind of dumbfounded with a look on his face that he didn't know what I was talking about. So I read it again and said what don't you understand, and basically number three, I believe about the answering of questions he was a little unsure of, and number four, about having an attorney present.

Q. And in fact he asked you if he needed a lawyer, is that right?

A. Yes.

Q. And you told him no, right?

A. I told him he would need one eventually. At that point in time we couldn't go out and get him one and bring him in there at that point because it wasn't feasible to bring an attorney to the police station. I have never done it in the past.

Q. And so you told him that he couldn't have a lawyer then?

A. I said—I didn't say he couldn't have, I just said at this point in time for this proceeding, no.

Q. So you told him that he didn't need a lawyer at that point, right?

A. Basically yes.

The government urges that the trial court properly relied on our decision in *United States v. Rawls*, 322 A.2d 903 (D.C. 1974) for the proposition that Sergeant Cortright's embellishments and modifications to the standard *Miranda* warnings did not constitute legal error. In *Rawls*, the officer embellished the standard *Miranda* warnings and indicated to the appellant that an attorney would be provided the next day and not prior to questioning. We concluded that the trial court erred in ruling that, as a matter of law, the officer's "unnecessary embellishment on the *Miranda* warnings rendered it void." *Id.* at 907. We remanded, however, for a determination whether, taking that embellishment into account as 'one factor' the defendant made a "knowing and intelligent waiver of his rights and that his waiver was voluntary." *Id.* at 907–08. In *Rawls*, we noted that "if it should later appear that such [embellished] a statement is being used in a manner which may well result in confusion on the part of the suspects as to their *Miranda* rights, this [holding] may then require examination."

*Id.* at 906 n. 12. This is the situation which has presented itself in the instant case.

Here, we are presented with an appellant who was clearly having trouble understanding what his rights were, and was therefore completely reliant on Sergeant Cortright's explanations and embellishments. Sergeant Cortright went beyond telling appellant that he couldn't have a lawyer during the interview, but "basically told him he 'didn't think he would need one,'" "... and that 'it would be best if [he] told [his] side of the story.'" Although embellishments are "but one factor to be considered in the determination of whether the defendant made a knowing and intelligent waiver of his rights," *id.* at 907 we find that in the totality of the circumstances, Sergeant Cortright's embellishments and directives that Di Giovanni didn't need a lawyer vitiated the validity of his waiver. Here, the facts surrounding the circumstances of Di Giovanni's questioning are fairly well developed and we think that the officers awareness of Di Giovanni's low intellectual capacity,[10] Di Giovanni's physical condition, his unfamiliarity with the *Miranda* warnings, and Sergeant Cortright's embellishments support our conclusion that his waiver was not made knowingly or intelligently. Therefore, the statements made to both Sergeant Cortright and Detective Carew and the gun must be suppressed.

▇▇ Having concluded that the trial court erred in denying Di Giovanni's motion to suppress, our focus turns to whether the error was harmless beyond a reasonable doubt. *See McIntyre v. United States*, 634 A.2d 940 (D.C.1993) (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). According to the Supreme Court in *Chapman*, the harmlessness test is "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* at 23, 87 S.Ct. 824. Based on the record before us, we are convinced that the statements and the weapon—in essence an admission by Di Giovanni that he fired the weapon that night—"might have contributed to the conviction." Therefore, we reverse and remand on this error.

## III.

Di Giovanni also asserts that the trial court erred in not granting his motion for judgment of acquittal, asserting that the government presented no evidence of specific intent to kill. Di Giovanni claims that the trial court erred in denying this motion because Grace was unaware of the direction of Di Giovanni's weapon when he was being shot and did not testify that he was the target of the shots. Additionally, Di Giovanni never indicated any intent prior to the shooting. Di Giovanni also asserts that he could not have formed the requisite intent to kill because the incident occurred at night in a dark location and appellant was not wearing his glasses.

The government contends that Di Giovanni's abrupt cessation of performing fellatio on Grace and that he fired a shot at Grace at close range are sufficient acts to prove guilt beyond a reasonable doubt. In addition, the government asserts that Di Giovanni's decision to pursue Grace after Grace had fallen down further exemplified Di Giovanni's specific intent to kill.

▇▇ In order to prove the assault with intent to kill while armed charges with respect to Grace, the government had to show beyond a reasonable doubt that Di Giovanni: (1) assaulted Grace; and (2) did so with specific intent to kill; (3) while armed. D.C.Code §§ 22–501, –3202. Rea-

**10.** Furthermore, during a pre-trial hearing, Dr. Linda Green testified that the appellant has difficulty following directions and understanding intricate conversations.

sonable jurors could find beyond a reasonable doubt that appellant attempted to assault Grace because he fired a shot at close range. Simply by firing in Grace's direction, Di Giovanni put Grace in a "zone of harm." In *Nixon v. United States*, 730 A.2d 145, 149 (D.C.1999), we recognized that "where the means employed to commit the crime against a primary victim created a zone of harm around that victim, the fact finder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone." *Id.* (quoting *Ruffin v. United States*, 642 A.2d 1288 (D.C.1994)). Therefore, even if the jury believed that Di Giovanni had aimed at two men who attacked him, since the gun was pointed in the direction of Grace, a jury could reasonably conclude that appellant knew Grace was in a zone of harm. Thus, the government presented sufficient evidence showing that the appellant acted with the specific intent to kill.

### IV.

■■■■■■■ Appellant also contends that the trial court erred in determining that a character witness could be questioned regarding Di Giovanni's prior arrest for assault with intent to kill. The trial court ruled that the character witness could properly be questioned about this prior arrest if Di Giovanni chose to introduce evidence of his character for peacefulness. "When ... a character witness is offered, he becomes subject to cross-examination as to his testimonial qualifications." *Darden v. United States*, 342 A.2d 24, 26 (D.C. 1975). Arrests are the proper subject of cross-examination of a character witness, not to impeach the credibility of the defendant, if he testifies, but to test the probative value of the witness's testimony. *See Michelson v. United States*, 335 U.S. 469, 482, 69 S.Ct. 213, 93 L.Ed. 168 (1948). The trial court "enjoys broad discretion" to limit or preclude entirely the cross-examination regarding the defendant's prior con-

victions. *See Morris v. United States*, 469 A.2d 432, 436 (D.C.1983). Thus, we find no reversible error here.

### V.

■■■■■ Appellant finally contends that the trial court erred in providing a standard jury instruction concerning flight because there was no evidence "to support flight by the defendant considering the proximity of the incident site to his automobile and the fact that he left the scene on foot."

The evidence showed that after Di Giovanni shot Grace he ran away, jumped into the creek, and swam to the other side, hid the gun next to the bank of the creek, and then deliberately tried to mislead the police by saying, "[t]here's a man with a gun up there." Thus, Di Giovanni's argument must fail, because there is sufficient evidence of flight.

Accordingly, we affirm in part, reverse in part, and remand the case to the trial court for further proceedings consistent with this opinion.

*So ordered.*