EPSTEIN, Associate Judge,
concurring in part and dissenting in part:
I concur in the conclusions that (1) Detective Howland’s prefatory comment did not make the subsequent Miranda warnings ineffective and (2) S.W. knowingly and intelligently waived his Fifth Amendment rights. I am, however, constrained to dissent from the holding that S.W.’s self-incriminating statements were involuntary. In my view, the majority opinion reaches the incorrect conclusion for three main reasons. First, the majority opinion incorrectly applies the standard of review by failing to give the trial court’s reasonable inferences and weighing of the evidence the deference to which they are entitled. Second, the majority opinion conflates the well-established distinction between a permissible statement that a suspect can help himself by cooperating and an impermissible statement that a suspect will be penalized if he chooses not to talk. Third, the majority opinion does not follow our precedent when it gives overriding importance to the detective’s initial statement to S.W. instead of treating it, as the trial court did, as only one factor in the totality of.the circumstances.
As the majority recognizes, ‘“cases in which a defendant can make a colorable argument that a self-incriminating statement was “compelled” despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.’ ” Dickerson v. United States, 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (quoting Berkemer v. McCarty, 468 U.S. 420, 433 n. 20, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). The majority concludes that this is one of those rare eases. This case, however, is even more rare than the cases contemplated by the Supreme Court: the majority concludes not just that S.W. made a “color-able” argument that his statement was compelled, but that his argument is so strong that we should reject the trial court’s finding that his statement was voluntary. The evidence that Detective How-land overbore S.W.’s free will is not so one-sided or overwhelming that we can or should substitute our judgment for the trial court’s.
Dorsey v. United States, 60 A.3d 1171, 1203 (D.C.2013) (en banc), establishes that we must defer to the trial court’s choice between two permissible views of the overall evidence concerning the voluntariness *114 of a confession. In Dorsey, we “consider[ed] the question of voluntariness on the present record to be exceedingly close,” id., but because of the deferential standard of review, we affirmed the trial court’s finding that the defendant confessed voluntarily. 'Similarly in Beasley v. United States, 512 A.2d 1007,1016 (D.C.1986), “we d[id] not condone certain ■ of the tactics used by the poliee in this case, and such tactics have made this a close case. Yet, we [wejre satisfied that the totality of the circumstances supports the trial court’s-finding of voluntariness.” Here, the question is not nearly as close as it was in Dorsey and no closer than it was in Beasley, so affirmance is again the right result.
I. The standard of review
In Dorsey, the court en banc reaffirmed that “[i]n reviewing the denial of a motion to suppress statements on constitutional grounds, we must defer to the trial court’s findings of historical fact as long as they are not clearly erroneous.” See 60 A.3d at 1190 (footnote and citations omitted). “The ‘clearly erroneous’ standard of review is highly constraining; it ‘plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it-is ... convinced that-had it been sitting as the trier of fact, it would have weighed the evidence differently.’” Id. at 1205 (quoting Anderson v. Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). Where “there are two permissible views of the evidence, the factfinder’s choice between them cannot be clearly erroneous.” She.60 A.3d at 1205-06 (quotation and citation omitted).
This deference includes the trial court’s ■ weighing of the evidence: “as a reviewing court, we may not usurp the prerogative of the [trial] judge, as the trier of fact, to determine credibility and weigh the evidence.” See Dorsey, 60 A.3d at 1205 (emphasis added, quotation and footnote omitted). In addition, “we must view ... the reasonable inferences that may be drawn from [the facts] in the light most favorable, to sustaining the court’s ruling.” See id. at 1190 (footnote and citation omitted). Because we defer to the trial court’s weighing of the evidence and reasonable inferences, deference to a voluntariness finding is required even when a suspect’s confession was videotaped, although we of course consider whether the videotape actually supports the trial court’s findings. See id. at 1205. .
“However, our review of the trial court’s legal conclusions is de novo.” Dorsey, 60 A.3d at 1190 (footnote and citation omitted); see, e.g., In re M.A., 33 A.3d 378, 381 (D.C.2011). This distinction between factual findings and legal conclusions reflects that “the trial court’s determination of vol-untariness is itself a mixed question of fact and law....” Frost v. United States, 618 A.2d 653, 657 (D.C.1992) (quotations and citations omitted).
That said, “an issue does not lose its factual character merely because its resolution -is dispositive of the ultimate” legal question. ’ Miller v. Fenton, 474 U.S. 104, 113, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (discussing appellate review of the volun-tariness of confessions). “The answer to the legal question about the voluntariness of the confession may turn upon the answer to a subsidiary factual question, say ‘whether in fact the police engaged in the-intimidation tactics alleged by the defendant.’ ” See Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc., — U.S. -, 135 S.Ct. 831, 842, — L.Ed.2d — (2015) (quoting Miller, 474 U.S. at 112, 106 S.Ct. 445).[1] “An appellate court will review the *115 trial judge’s factual determination about the alleged intimidation deferentially (though, after reviewing the factual findings, it will review a judge’s ultimate determination of voluntariness de novo).” Teva Pharmaceuticals, 135 S.Ct. at 842. As we recently held in a case involving an analogous issue, we review de novo on appeal the ultimate question of whether evidence withheld in violation of Brady is material, but we give “due appreciation for the fact-bound nature of that ultimate question” and therefore “defer in this case to the motions judge’s assessments of credibility, evaluations of the weight of the evidence and the inferences to be drawn therefrom, and findings of historical fact, so long as they have record support.” Turner v. United States, 116 A.3d 894, 915 (D.C.2015).
Independent appellate review of ultimate determinations of voluntariness serves three purposes: (1) “a unitary system of law” requires consistent results in eases with no significant difference in the facts; (2) independent review is “necessary if appellate courts are to maintain control of, and to clarify, the legal principles” because the legal rules “acquire content only through application,” and (3) “de novo review tends to unify precedent and will come closer to providing law enforcement officers with a defined set of rules which, in most instances, makes it possible to reach a correct determination beforehand” about whether their conduct is constitutional. See Ornelas v. United States, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (quotation omitted). Ornelas involved appellate review of determinations of probable cause and reasonable suspicion, but the reasons' for de novo review of the ultimate question apply equally to voluntariness of a confession.[2]
Independent appellate review of the ultimate legal question empowers appellate courts to reject trial courts’ findings of voluntariness when confessions are “procured by means ‘revolting to the sense of justice.’ ” Miller, 474 U.S. at 109, 106 S.Ct. 445 (quoting Brown v. Mississippi, 297 U.S. 278, 286, 56 S.Ct. 461, 80 L.Ed. 682 (1936)). De novo review requires reversal when “certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment.” See Miller, 474 U.S. at 109, 106 S.Ct. 445. An appellate court’s duty to make an independent evaluation of the record “is not limited to instances in which the claim is that the police conduct was inherently coercive,” and it “applies equally when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have.been the product of a free and rational will.” Id. .at 110, 106 S.Ct. 445; see, e.g., Arizona v. Fulminante, 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 ■ (1991) (“Although the question is a close one, we agree with the Arizona Supreme Court’s conclusion that Fulmi-nante’s confession was coerced” because he was told that his life would be in danger if he did not confess).
*116 Thus, the “fact-bound” aspect of the ultimate legal question, see Turner, 116 A.3d at 915, is whether a particular suspect’s “will was in fact overborne,” and the ultimate legal question is “whether the techniques for extracting the statements, as applied to this suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means.” See Miller, 474 U.S. at 116, 106 S.Ct. 445. As an appellate court considering the ultimate legal question, we ask whether, “even if [the particular suspect] were unusually resistant to psychological coercion, ‘the technique used here risks overcoming the will of the run-of-the-mill suspect.’” United States v. Harrison, 34 F.3d 886, 892 (9th Cir.1994) (quoting Collazo v. Estelle, 940 F.2d 411, 426 (9th Cir.1991) (Kozinski, J., concurring)).
II. Benefits of cooperation vs. penalties for non-cooperation
Before I turn to the facts of this case, it is useful to discuss a critical distinction between (1) telling a suspect that he can help himself by cooperating and (2) telling a suspect he will be penalized if he chooses not to cooperate. The first type of statement by the police does not necessarily invalidate a confession, although it may combine with other factors to support a finding that a confession was involuntary. On the other hand, the second type of statement is highly likely to preclude a finding that a confession is voluntary.
This court and other courts have consistently held that telling a suspect that he can help himself by waiving his Fifth Amendment rights is only one factor that courts should consider in deciding whether a defendant’s statement to the police was voluntary. Beasley confirms that promises of leniency do not necessarily invalidate a confession: “any alleged promises by the police of leniency in exchange for a confession must be viewed by the trial court under the totality of all the surrounding circumstances to determine whether they were sufficient to overbear [the suspect’s] free will.” 512 A.2d at 1016 (quotation and citation omitted). Similarly, in United States v. Thomas, 595 A.2d 980, 983 (D.C.1991), we concluded that an interview including threats and promises involving cooperation was “plainly not without its inducive elements” but did not involve “police oppression or overreaching approaching the type” requiring suppression of confessions as involuntary. M.A., 33 A3d at 381-82, concluded that statements by the detective to the suspect that “the best thing you can do is tell the truth” did not directly contradict the Miranda warnings or invalidate his voluntary waiver. Citing M.A. and other cases, the majority opinion agrees that “not all forms of pressure to waive Miranda rights to avoid adverse consequences are coercive and in violation of Miranda.”
Likewise, the Supreme Court upheld a trial court’s finding that police officers’ statements that a cooperative attitude would benefit the suspect did not coerce the confession, even though the suspect was only 16 years old. Fare v. Michael C., 442 U.S. 707, 727, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). Multiple federal courts of appeal have concluded that a police officer’s statement that a suspect can help himself by speaking does not render the suspect’s subsequent statement involuntary. E.g., United States v. Jaswal, 47 F.3d 539, 542 (2d Cir.1995) (“Generally, promises of leniency will not render a confession involuntary.”); Miller v. Fenton, 796 F.2d 598, 607, 608-10 (3rd Cir.1986) (a confession was voluntary even though the interrogator assured the suspect that he just wanted to help and did not believe the suspect was a criminal who should be punished); United States v. *117 Umaña, 750 F.3d 320, 344 (4th Cir.2014) (“We have consistently declined to hold categorically that a suspect’s statements are involuntary simply because police deceptively highlight the positive aspects of confession,” including telling “the suspect that by talking to them he would do nothing but help himself’ or “things would go easier on the suspect if he confessed”) (quotations and citations omitted); United States v. Ornelas-Rodriguez, 12 F.3d 1339, 1348 (5th Cir.1994) (upholding finding that defendant voluntarily confessed after being told there were advantages to cooperation); United States v. Otters, 197 F.3d 316, 318 (8th Cir.1999) (“The promise of leniency — not to file charges associated with the traffic stop — was not enough by itself to make Otters’s statements involuntary.”); United States v. Okafor, 285 F.3d 842, 847 (9th Cir.2002) (“Inducements to cooperate are not improper and do not render a suspect’s statement involuntary unless under the total circumstances it is plain that they have overborne the free will of the suspect.”).
On the other hand, the police may not tell a suspect that exercising his right to remain silent will make him worse off than he would otherwise be. Albeit in dictum, Dorsey approvingly quoted Harrison for the proposition that “there are no circumstances in which law enforcement officers may suggest that a suspect’s exercise of the right to remain silent may result in harsher treatment by a court or prosecutor.” Dorsey, 60 A.3d at 1204 & n. 109 (quoting Hanison, 34 F.3d at 891-92). At the same time, Harrison recognized that “the police generally may offer to tell the prosecutor about the defendant’s cooperation and suggest that cooperation may increase the likelihood of a more lenient sentence.” 34 F.3d at 891 (citations omitted). Harrison went on, “In many ways, both types of statements are simply different sides of the same coin: “waive your rights and receive more favorable treatment’ versus ‘exercise your rights and receive less favorable treatment.’ ” Id. However, Harrison drew a substantive distinction between the two types of statements because “[rjefusal to cooperate is every defendant’s right under the fifth amendment” and “[u]nder our adversary system of criminal justice, a defendant may not be made to suffer for his silence.” Id.[3]
“The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw.” Dickerson, 530 U.S. at 444, 120 S.Ct. 2326 (quotation and citation omitted). Nevertheless, we draw the line between (1) statements about the benefits to a suspect of cooperation and (2) statements threatening harsher treatment of suspects who exercise their constitutional rights. If the interrogator’s statement is on the wrong side of the line, our obligation to conduct a de novo assessment of the ultimate legal question of voluntariness generally requires us to suppress a confession even if the trial court found that the suspect nevertheless confessed voluntarily. “We can’t allow police to advise suspects that they will pay dearly for taking advantage of their right to counsel precisely because some suspects will succumb to the pres *118 sure, even if this suspect did not.” Colla-zo, 940 F.2d at 427 (Kozinski, J., concurring).
In drawing this line in any specific ease, we must keep in mind the fact that “Custodial interrogations implicate two competing concerns.” See Moran v. Burbine, 475 U.S. 412, 426, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), On the one hand, police interrogation is a necessary “tool for effective enforcement of criminal laws,” and “[a]dmissions of guilt are ... essential to society’s compelling interest in finding, convicting,' and punishing those who violate the law.” Id.; see Davis v. United States, 512 U.S. 452, 461, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (one “side of the Miranda equation” is “the need for effective law enforcement”). “On the other hand, the Court has recognized that the interrogation process is inherently coercive and that, as a consequence, there exists a substantial risk that the police will inadvertently traverse the fine line between legitimate efforts to elicit admissions and constitutionally impermissible compulsion.” Moran, 475 U.S. at 426, 106 S.Ct. 1135 (quotation and citation omitted). Thus, in deciding whether the interrogator crossed the line in a particular case, we must strike a balance between society’s compelling interest in uncoerced admissions of guilt and protecting suspects from coercion.
III. Applying the standard of review to the facts
If we apply the correct standard of review to S.W.’s confession, the result is straightforward: the trial court’s finding that S.W.’s will was not overborne is based on a permissible view of the evidence, so we must defer to it.
The key factor in the majority’s-conclusion that S.W.’s confession was not voluntary is Detective Howland’s brief prefatory statement before he gave the- Miranda warning and before S.W. knowingly- and voluntarily waived his constitutional rights. For the reasons I explain in Section A, characterizing the detective’s statement as threatening a penalty for silence is inconsistent with the record and fails to give the required deference to the trial court’s inferences. For the reasons I explain in Section B, the majority'opinion errs by giving overriding weight to the detective’s statement instead of treating that statement, as the trial court did, as one factor to be weighed in assessing whether S.W.’s will was overborne. Finally, Section C explains why the reasons for independent appellate- review of ultimate determinations of voluntariness do not support disregarding the trial court’s weighing of the relevant factors. •

A. Detective Howland’s statement

The majority opinion treats Detective Howland’s pre-Miranda statement to S.W. as an attempt to impose a “penalty” on S.W. for invoking his constitutional rights. For the reasons explained in Part II, I agree that if Detective Howland had made such a threat, he would have engaged in prohibited coercion. However, I do not agree that Detective Howland crossed this line. His statement at most approached the kind of genéral statement about benefits of cooperation that we and other courts have routinely found not to be inherently coercive and to be consistent with a voluntary waiver.
As a threshold matter, we must defer to the trial court’s assessment of Detective Howland’s ambiguous statements. The majority opinion agrees that the trial court fairly characterized Detective Howland’s introductory remarks as general statements that simply provided context for the boilerplate Miranda warnings that followed. The majority opinion acknowl *119 edges that “Detective Howland did not explicitly tell appellant that ‘it might be worse’ for him if he invoked his rights, as in Collazo.” The majority opinion adds that Detective Howland “strongly implied-it,” but we should defer to the trial court’s reasonable inferences from the detective’s words. “An appellate court will review the trial judge’s factual determination about the alleged intimidation deferentially....” See Teva Pharmaceuticals, 135 S.Ct. at 842 (citing Miller, 474 U.S. at 112, 106 S.Ct. 445); Loza v. Mitchell, 766 F.Bd 466, 479 (6th Cir.2014) (concluding, after re-' viewing the video recording and transcript of the defendant’s interrogation, that it was “not unreasonable” for the state court to determine that the detectives did not threaten to harm the defendant’s girlfriend and unborn child unless he confessed).
Although he set himself apart from the lions who thought S.W. “did a whole bunch of stuff,” Detective Howland did not suggest to S.W. that he would give S.W. a pass if he made incriminating statements. To the contrary, Detective Howland explicitly told S.W. that he thought S.W. committed the carjacking: “I think what happened today was just a one-time thing.” Moreover, his statement to S.W. about the lions was immediately followed by the Miranda warning that any statement by S.W. can be used against him in court. See Jaswal, 47 F.3d at 542 (“There is no inconsistency between the required- warning that the defendant’s statement may. be used against him and a further statement, that cooperation can help him” because “[b]oth are true”). The trial court reasonably found that S.W. understood that he was facing a significant set of charges.
To the extent that Detective Howland implied that cooperation might help. S.W., his statement was not inherently coercive. See Part' II above. In Fare, “[t]he police did indeed indicate that a cooperative attitude would be to respondent’s benefit,” but the Supreme Court nevertheless upheld a. finding that the confession was voluntary because the officers’ “remarks in this regard were far from threatening or coercive” — even to a 16-year-old juvenile. 442 U.S. at 727, 99 S.Ct. 2560. At most, Detective Howland implicitly suggested what the interrogator in Fare explicitly told the juvenile in that case — that a cooperative attitude would benefit S.W.
As the videotape shows, Detective How-land’s manner makes his words even farther from threatening or coercive than they may seem in a written transcript. S.W. himself correctly characterizes Detective Howland’s tone as “avuncular.” Detective Howland was matter-of-fact and low key — not aggressive, threatening, or overbéaring. Cf. Collazo, 940 F.2d at 416 (one factor contributing to coerciveness was that the interrogator’s tone and presentation were “insistent”). Detective Howland was also rather distracted: the transcript in the majority opinion omits that when Detective Howland first started to say “I stand between you . •..,” his phone rang, and he looked at his phone and started over; then he again did something with his phone and had to re-focus his attention. As the trial court stated, and the videotape confirms, Detective Howland kept his physical distance from S.W. — not getting in S.W.’s face or space.
The majority opinion characterizes Detective Howland’s statement “as a veiled threat” to penalize S.W. if he invokes his constitutional rights. It was up to the trial court to determine what, if anything, was behind any veil, but the record indicates that Detective Howland’s statement was-not a threat, veiled or otherwise. It would be coercive if Detective Howland had told S.W., as the detectives told the suspect in Dorsey, that law enforcement officials “are going to up the charges unless you tell the *120 truth.” See 60 A.3d at 1186. But Detective Howland said nothing like that. He stated that the lions had already concluded that S.W. “did' a whole bunch of stuff,” and he did not tell S.W.->-directly or indirectly — that the lions would try to pin other crimes on S.W. only if he remained silent. I therefore do not agree with the majority opinion that Detective Howland told S.W. that the lions would attempt to hold him responsible for crimes in addition to the carjacking “unless appellant, accepted the opportunity ‘to give [his] version of what happened,’ ” At most, the detective said that things were already bad for S.W. and might get better if he talked — not that things were not nearly as bad as they would become if he chose not to talk.
The majority opinion also states, “Taken together, these statements seem to suggest that if appellant remained silent, he would face fabricated charges for things that he did not do.” There is absolutely no support in the record for any speculation that (1) the lions would fabricate, charges if S.W. remained silent, or (2) the lions had already fabricated charges and did not genuinely believe S.W. was guilty of any crime other than the carjacking. Notably, S.W. does not argue that .the “lions” fabricated other charges or that they would do so if and only if he remained silent, and he attributes to them only an “erroneous belief’ that S.W. was responsible for other crimes. When Detective Howland testified at the hearing on the suppression motion, the defense did not elicit, and the government had no reason to elicit, testimony from him about the good faith of the other officers. In any event, to overturn the trial court’s finding that S.W.’s will was not overborne, we need more than statements that only “seem to suggest” that the police were overreaching.
For these reasons, the majority’s spin on Detective Howland’s words effectively erases the critical distinction discussed in Part II between telling a suspect that cooperation will benefit him and telling him that' he will be penalized if he exercises his rights. If Detective Howland’s words constitute a threat to impose a penalty on S.W. for invoking his constitutional rights, then any and all statements that any interrogator makes about the benefits of cooperation would constitute a threat. The majority opinion asserts, “In essence, by portraying himself, as protective from the ‘lions out there,’ Detective Howland supplied the reverse implication: that if appellant does not waive his rights, Detective Howland will throw him to the ‘lions.’” But if any statement that cooperation will help necessarily has the “reverse implication” that the interrogator will retaliate against the suspect if he does not cooperate, the distinction between the two types of statements would be eliminated. A defendant who chooses to forego any benefit from cooperation by remaining silent may end up worse off than if he had chosen to talk, but that does not mean he would be penalized for his silence. By drawing the distinction between promises of benefits from cooperation and threats of retaliation for non-cooperation, the courts have struck the appropriate balance between (a) protecting society’s compelling interest in keeping interrogation as an effective tool to elicit confessions from guilty people and (b) protecting innocent people from an interrogation process that is inherently coercive. See Moran, 475 U.S. at 426-27, 106 S.Ct. 1135. The majority opinion upsets this balance and undermines this compelling societal interest.
Put differently, Detective Howland did not say anything calculated to produce a false confession about, the carjacking. It is “necessarily coercive” for the police to engage in “conduct that influences a rational *121 person who is innocent to view a false confession as more beneficial than being honest,” so “our task is to examine whether [the suspect] was not able to make a rational decision due to promises made by the interrogating detective.” See United States v. Villalpando, 588 F.3d 1124, 1128 (7th Cir.2009). Detective Howland did not say anything that would influence a rational person who is innocent to decide that a false confession to the carjacking would make him better off than remaining silent. As with the juvenile’s confession in In re D.A.S., 391 A.2d 255, 259 (D.C.1978), “the record provides an adequate basis for the trial court’s conclusion that the confession was the product of a knowing, intelligent and voluntary waiver of appellant’s rights,” and the interrogation technique “practiced here by the police was not of the sort which would induce a false confession or would overcome the appellant’s will.”[4]

B. The totality of the circumstances and the weighing of the evidence

“The presence of official compulsion— ‘coercive police activity’ or ‘police overreaching1 — is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause.” Turner, 116 A.3d at 935. “That said, in determining whether a defendant’s will was over-borne in a particular case, the Court has assessed the totality of all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation.” Id. (quotation, brackets, and citation omitted). Likewise, “the totality-of-the-circumstances analysis still applies in determining the validity of the waiver and the voluntariness of the statement even though the interrogation involves a juvenile.” In re M.A.C., 761 A.2d 32, 36 (D.C.2000) (citing Fare, 442 U.S. at 725, 99 S.Ct. 2560). ‘“[A]dmis-sions and confessions of juveniles require special caution,’ ” but even with juveniles, “rather than giving overriding importance to any one factor, the court must consider the totality of circumstances surrounding the confession.” See D.A.S., 391 A.2d at 258 (quoting In re Gault, 387 U.S. 1, 45, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)).
Instead of treating Detective Howland’s alleged threat as only a “necessary predicate” to a finding of involuntariness, the majority opinion gives it the “overriding importance” that D.A.S. holds it should not get. The trial court properly considered all the relevant factors in examining the totality of the circumstances, and its comprehensive analysis reasonably supported its finding that S.W.’s confession was voluntary. As the majority opinion states, the voluntariness “inquiry rests on many of the same factors mentioned in our ‘knowing and intelligent’ inquiry,” and the same factors that the majority opinion agrees demonstrate that S.W. waived his rights using his own rational thought and intellect also demonstrate that he waived them voluntarily.
As I discussed in Section A, Detective Howland made only a general, non-threatening suggestion that S.W. might help himself by cooperating, and his manner was avuncular and matter-of-fact — not aggressive or relentless. After his prefatory *122 statement, Detective Howland immediately gave effective Miranda warnings, and as the majority opinion recognizes, it is a. “rare” case “in which a defendant can make a colorable argument that a self-incriminating statement was ‘compelled’ despite the fact that the law enforcement authorities adhered to the dictates of Miranda ...Dickerson, 530 U.S. at 444, 120 S.Ct. 2326 (quotation and citation omitted). The other relevant factors also strongly support, or are consistent with, the trial court’s finding of that S.W.’s confession was not coerced.
First, several objective factors involving the structure of the interview support the finding of voluntariness. Detective How-land was the only detective present during the interview, so this is not a case where a group of interrogators bore down on a lone suspect. S.W. confessed immediately after Detective Howland began asking questions, and S.W. was not worn down by hours of relentless questioning. See In re J.F., 987 A.2d 1168, 1177 (D.C.2010) (“J.F.’s vulnerability was exacerbated by the fact that he was questioned for three hours.... ”); Miller, 796 F.2d at 606 (an interrogation lasting less than an hour “was not ‘a process of interrogation ... so prolonged and unremitting, especially when accompanied by deprivation of refreshment, rest or relief, as to accomplish extortion of an involuntary confession’”) (quoting Stein v. New York, 346 U.S. 156, 184, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953)). Including interruptions from his phone, the detective’s comments about the “lions” took literally 30 seconds, and he spent more time administering the Miranda warnings that followed.
Second, S.W.’s behavior and demeanor strongly support the trial court’s finding. Even though S.W. was only 15 years old, he maintained a steady and calm demeanor when he waived his Miranda rights and answered the detective’s questions about what* happened that afternoon. Nothing in S.W.’s words or body language indicates that he was intimidated or frightened or confused by Detective Howland’s statement about the lions or that it affected his decision to answer the questions about the incident at the gas station. See Beasley, 512 A.2d at 1016 (“appellant’s own behavior during the interrogation indicates that the officers’ statements were not sufficient to coerce a ... confession.”).[5]
In these circumstances, the trial court reasonably found that S.W. wanted to talk about the carjacking incident. The trial court did not make a factual finding about the specific reason why S.W. decided to admit- his involvement in the - carjacking, but many people who understand that their statements can be used against them nevertheless confess without any coercion. Cf. Dorsey, 60 A.3d at 1205 (where the trial court found that Mr. Dorsey confessed because he was remorseful); Miller, 796 F.2d at 613 (“Many criminals experience an urge during interrogation to own *123 up to their crimes — ”).[6] As the trial court also found, S.W. picked and chose the questions he wanted to answer, and he had no difficulty deciding not to answer certain questions — an approach inconsistent with any supposition that his will was overborne because the interrogator convinced him that his situation was hopeless. I would add that S.W. did not testify or present any direct evidence that he felt intimidated or coerced by anything Detective Howland said or did or that he understood the detective to be telling him that the detective would throw him to the lions unless he talked to him without a lawyer.[7]
Third, “no special factors indicated that [S.W.] was unable to understand the nature of his actions.” See Fare, 442 U.S. at 726 (upholding the voluntariness of a confession of a 16-year-old suspect). “There is no indication that [S.W.] was of insufficient intelligence to understand the rights he was waiving, or what the consequences of that waiver would be.” See id. As the majority opinion agrees, the trial court noted the absence of mental health concerns. The trial court did not rely on information that S.W. had been in custody before, because there were no real specifics about his prior contacts with the criminal justice system, including prior Miranda warnings. See Fare, 442 U.S. at 726, 99 S.Ct. 2560 (discussing the significance of prior experience with the police).
On this record, the trial court reasonably concluded that S.W. confessed because he made a voluntary decision to waive the rights that he understood he had, and the “special caution” with which we must consider confessions by juveniles (see In re D.A.S., 391 A.2d at 258) does not compel the conclusion that S.W.’s confession was coerced. In the circumstances of this case, the trial court’s finding concerning the subsidiary factual question (was S.W.’s will overborne?) is dispositive of the ultimate legal question of voluntariness, which itself has a fact-bound nature. See Teva Pharmaceuticals, 135 S.Ct. at 841-42; Turner, 116 A.3d at 915. The deferential nature of the review in these circumstances helps to explain why we have affirmed in close cases where the trial court found a confession to be voluntary. See, e.g., Dorsey, 60 A.3d at 1203; Beasley, 512 A.2d at 1016.
I do not suggest that the majority’s view of the evidence is unreasonable. If the trial court had drawn the same inferences from the historical facts that the majority opinion draws and weighed the factors relevant to voluntariness in the same way the majority opinion does, and if the government had then appealed a finding that S.W.’s confession was not voluntary, I would affirm the ruling under the deferential standard of review. However, Dorsey is only one in a long line of cases that precludes us from usurping the trial court’s role, and it requires us to affirm if the trial court’s weighing of the evidence is permissible, even if we would weigh the evidence differently if we were the factfin-ders. I consider the trial court’s weighing of the evidence as a whole to be eminently reasonable: S.W.’s age and Detective Howland’s preface may have created a risk that S.W. would feel pressured to waive his rights; but the risk did not in' fact materialize because the detective’s comment preceding the Miranda warnings *124 was not threatening or coercive, his tone was avuncular, S.W. was composed and relatively mature for his age, and S.W. unhesitatingly decided to confess in a brief interview in which he chose not to answer numerous other questions.

C. A middle-of-the-road ruling

For the reasons explained in the preceding sections, the trial court’s finding on this record that S.W.’s statement was voluntary is fully consistent with precedent and “with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means.” See Miller, 474 U.S. at 116, 106 S.Ct. 445. As I discussed in Part I, it is only when interrogation tactics are “revolting to the sense of justice” or “offensive to a civilized system of justice” that appellate courts must reject the trial court’s finding of vol-untariness. See id. at 109, 106 S.Ct. 445 (quotation and citation omitted). Detective Howland’s approach did not come close to violating that standard. The majority opinion does not demonstrate that Detective Howland’s statements were different in kind or even degree from the statements by interrogators about the benefits of cooperation that courts have consistently held do not preclude a finding of voluntariness.
Because the trial court’s voluntariness finding is in the mainstream, overturning it would not serve, and would in fact undermine, the purposes of independent appellate review of the ultimate legal determination. See Section I above. First, reversing the trial court’s ruling would produce a result inconsistent with the results in cases with comparable facts. Second, it would leave law enforcement officers with a more poorly defined and indeed newly conflicting set of rules about how to conduct interrogations. Third, we can “maintain control of ... the legal principles” without reversing the trial court here. See Ornelas, 517 U.S. at 697, 116 S.Ct. 1657.
The majority opinion compares this case to Collazo, but the totality of the circumstances there stand in sharp contrast to the totality of the circumstances concerning S.W. In Collazo, the police conduct was egregious by any standard, and the Ninth Circuit emphasized circumstances that are simply not present here. One critical difference is that that Mr. Collazo confessed after he invoked his right to counsel and a police officer then made coercive statements in order to induce Mr. Collazo to change his mind. Instead of respecting Mr. Collazo’s request to talk to a lawyer, one of two officers (Officer Destro) told him, “This is your last chance to talk to us” and “it might be worse for you” if he followed his lawyer’s advice not to talk to the police. 940 F.2d at 414. The Ninth Circuit concluded that Officer Destro’s words, “understood plainly, were coercive,” and his “warning that it ‘might be worse’ for Collazo if he did not cooperate with the police can only be seen as menacing” and as attempting “to impose a penalty on” Collazo’s invocation of his constitutional rights. Id. at 414, 417. That conclusion was supported by the prosecutor’s own characterization of “Officer Destro’s tone and presentation as ‘insistent.’ ” 940 F.2d at 416. The Ninth Circuit also pointed to credible testimony from the defendant: “Collazo testified he was scared, and that Officer Destro’s threats are what caused him to change his mind and talk without counsel.” Id. at 421. The Ninth Circuit stressed (as we did in Dorsey, 60 A.3d at 1200-01) that “[a]t a point where the law required him to back off, [the interrogator] did not scrupulously honor Collazo’s right to cut off questioning; he stepped on it.” Id. at 417.
*125 Here, in contrast, S.W. did not ask to speak with a lawyer and instead knowingly and unhesitatingly waived his right to do so after Detective Howland gave Miranda warnings. Nor did Detective Howland “demean[ ] the pre-trial role of counsel by dispensing a one-sided, unauthorized legal opinion.” Collazo, 940 F.2d at 418. In addition, S.W. did not testify, as Mr. Collazo did, that he was scared and that the interrogator’s statement was the reason he decided to waive his rights and confess.[8]
On the other hand, this is no more difficult a case than the two cases that we considered close and in which we still upheld the trial court’s finding that the confessions were voluntary. Dorsey is much closer to the line, and Beasley is no further from the line — even taking into account that the suspects in these two cases were adults, not juveniles like S.W.
Look at the facts in Dorsey:
• “Dorsey endured a grueling overnight interrogation during which, as the government concedes, detectives violated the rules of Miranda v. Arizona and Edwards v. Arizona [451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) ] by continuing to press him to confess after he invoked his Fifth Amendment rights — both his right to cut off further questioning and remain silent, and his right to have counsel present during his questioning.” Dorsey, 60 A.3d at 1176-77.
• The detectives expressly told Mr. Dorsey that the prosecutors “are going to up the charges unless you tell the truth.” Id. at 1186.
• In the five-and-one-half hours after the defendant asserted his Fifth Amendment right to counsel, three officers “persisted in trying a variety of techniques to persuade Dorsey to give in and confess.” Among other things, “[t]hey deprived him of needed sleep, ignored his evident physical discomfort and symptoms of alcohol withdrawal, and emphasized his powerlessness until they ‘finish[ed] up what [they] ha[d] to do;’” and “[t]hey disparaged Dorsey’s desire to talk to a lawyer and to go to court, implying that counsel would give him bad advice and that he could not receive a fair trial.” Id. at 1197.
• The detectives “took no curative measures at all to counter the impact of the improper badgering Dorsey had endured.” Id. at 1198.
• “The [detectives’] violations of Miranda were flagrant: Ross and Thompson persisted' in questioning Dorsey and urging him to change his mind despite his repeated assertions of his constitutional rights; verbally abused him (e.g., by repeatedly calling him a liar); disparaged his request for *126 counsel and a hearing in court as contrary to his best interests; misrepresented to him the benefits of confessing before consulting with counsel (e.g., telling Dorsey that he could plead to ‘a straight robber/ so that ‘all that other shit don’t come in’); threatened that the prosecutors would ‘up the charges’ if he did not confess; ex-' aggerated the strength of the evidence against him; and - fed him what he should say to put himself in a more appealing light.” Id. at 1200-01. •
• “It was as if the detectives had told him explicitly that his Miranda rights were inoperative on this occasion.” .Id. at 1202.
It was on these facts that “[w]e considered] the question of voluntariness on the present record to be exceedingly close” and concluded that “such overreaching tactics must be condemned.” Id. at 1203-04. We deemed it “particularly troubling the detectives’ warnings to Dorsey that he would suffer adverse. consequences if he insisted on consulting counsel and exercising his constitutional rights, their provision of dubious legal advice to sway Dorse/s judgment, and their suggestions as to what, story Dorsey could tell to .minimize the gravity of his crimes.” Id. at . 1204. Yet we upheld the voluntariness of the confession-that Mr. Dorsey made after he had gotten some sleep and some food and decided that he was remorseful about his actions. ■ Id. at 1205-1206.
However critical one may be of Detective Howland’s statements to S.W., they did not begin to approach the blatant overreaching in Dorsey, and virtually all of the other relevant factors indicate that S.W.’s conféssión was voluntary. Among other things, Detective Howland did not ignore any invocation of rights, and his comment that he stood between S.W. and the “lions” was immediately followed by explicit and effective Miranda warnings.
In Beasley, we upheld the trial court’s voluntariness finding and rejected Mr. Beasle/s argument that the interrogators’ promises of leniency and their deceptions about the strength of the government’s evidence constituted psychological coercion. After Mr. Beasley waived his rights and denied any knowledge of the alleged crime, the interrogating officers “told appellant' that he should ‘help himself and ‘tell the truth’ ” and that “any cooperation would be communicated to the prosecutor,” and they “repeated a number of misleading statements to appellant concerning the strength of the evidence against him.” 512 A.2d at 1016. The defendant decided to confess only- after he met with a detective whom he knew and trusted and who told him to “tell the truth” about the homicide. Id. at 1010, 1016. “We thought] it is beyond dispute that these remarks were intended to cause appellant to believe that he might as well confess because" the weight of the'evidencé against him was overwhelming,” and we could not “say with certainty that such statements had no effect whatsoever on appellant’s state of mind.” Id. at 1016. But even though we did not condone the police tactics that made it a “close case,” we concluded “that appellant’s own behavior during the interrogation indicates that the officers’ statements were not sufficient-to coerce a false confession.” Id.
By- the. same token, even if Detective Howland’s suggestion that S.W. should help himself by talking had some effect on S.W.’s state of mind, S.W.’s behavior during the interview, and the other relevant factors, indicate that the - suggestion was not sufficient to coerce a false confession. There is no evidence that Detective How-land’s statement about the “lions” was inaccurate or misleading. The detectives in *127 Beasley made statements to overcome Mr. Beasley’s initial refusal to confess, and Detective Howland did not have the history with S.W. that the detective who finally persuaded Mr. Beasley to talk had with Mr. Beasley.
For all of these reasons, I would uphold the trial court’s denial of S.W.’s motion to suppress his confession.

. Teva Pharmaceuticals decided the standard of review of a trial court’s construction of *115 patents, but it relied on Miller, a case involving the analogous issue of appellate review of trial court decisions about the voluntariness of confessions.

. Although Ornelas held that “as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal,” the Supreme Court "hasten[ed] to point out that' a reviewing court should take care both'to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.” Id. at 699, 116 S.Ct. 1657.

. We have recognized the same issue in the sentencing context, where a sentencing judge may impose a lighter sentence if a defendant decides to plead guilty and accept responsibility, but may not impose a heavier sentence on a defendant because the defendant decides to exercise his constitutional right to a jury trial. "The line between affording leniency to a defendant who has admitted guilt by pleading guilty and punishing one who has denied his guilt and proceeded to trial is elusive, to say the least.” Coles v. United States, 682 A.2d 167, 169 (D.C.1996).

. The other dissenting opinion suggests that in making these statements based on holdings in our earlier cases, I am losing sight of the purpose of Miranda warnings not only to forestall false confessions but also to protect the privilege against self-incrimination. As D.A.S. indicates, relevant to whether an interrogator’s statement is coercive is whether the statement is likely to elicit a false confession. Detective Howland’s statement does not fall into that category. There is no suggestion that S.W. confessed to a crime he did not commit; the victim identified S.W. in a show-up shortly after the carjacking and again at trial, and S.W. did not contest at trial the victim’s account of his actions.

. The majority opinion states that "there is some confusion as to how long appellant had been in custody” when his brief interview began, and that this factor "appears to weigh in favor of an involuntary waiver.” The other dissenting opinion attributes significance to the gap between S.W.’s arrest (which was shortly after the carjacking) and the interview. S.W. did not make this argument, even though he is represented by highly competent counsel. S.W. states in his brief that the interview began at 11:54 "a.m.” shortly after he was arrested, and this indicates to me that Detective Howland simply misspoke when he said "p.m.” instead of "a.m.” when he began the interview. In any event, if we are concerned about an issue that was not briefed here or raised in the trial court, we should ask the parties to brief the issue or remand the case to the trial court for further evidence or at least additional findings. For example, although the other dissenting opinion asserts that S.W.’s "exhaustion is evident in the video,” exhaustion is not evident to me.

. Cf. Towles v. United States, 115 A.3d 1222, 1229 (D.C.2015) (many people voluntarily consent to searches by the police even though they know that the searches will reveal contraband).

. The government could not have used S.W.’s testimony at the suppression hearing against him in its case-in-chief at trial. See Simmons v. United States, 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

. I do not agree with the majority that Di Giovanni v. United States, 810 A.2d 887 (D.C.2002), and Lee v. State, 418 Md. 136, 12 A.3d 1238, 1250-51 (2011), are "contra” to the trial court’s conclusion. Di Giovanni concluded that the defendant’s waiver was not knowing and intelligent because he "was initially misinformed and confused as to what [his constitutional] rights were.” 810 A.2d at 892. The interrogator "went beyond telling appellant that he couldn’t have a lawyer during the interview, but basically told him he 'didn’t think he would need one' ” "and that ‘it would be best if [he] told [his] side of the story,’ ” and additional facts supporting our conclusion that Di Giovanni's waiver was not knowing or intelligent were “the officers’ awareness of Di Giovanni’s low intellectual capacity, Di Giovanni’s physical condition, [and] his unfamiliarity with the Miranda warnings.” Id. at 894. In Lee, the detective's statement that "this is between you and me, bud” violated Miranda by "undermining the warning” that the defendant’s statements could be used against him. 12 A.3d at 1250-51.